Zedric TURNER, Jr., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 94–18C.

United States Court of Federal Claims.

Aug. 26, 1999.

Martin A. Kilpatrick, Greenville, Mississippi, attorney of record for plaintiff.

S. Lane Tucker, Washington, D.C., Department of Justice, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

*OPINION*

ALLEGRA, Judge.

This civilian pay case is currently before the court on cross-motions for summary

judgment. Plaintiffs are employees or former employees of the United States Department of the Army, Corps of Engineers (the Corps), based in various northern Mississippi counties. They raise two distinct claims. First, the plaintiffs, other than Zedric Turner, Jr., argue that the existing federal wage survey area under which they are or were paid, should be the higher-paying Memphis, Tennessee survey area, rather than the lower-paying Northern Mississippi survey area.[1] Second, Mr. Turner argues that, between 1980 and 1992, the Corps arbitrarily assigned him to the Northern Mississippi wage area, rather than the higher-paying Jackson, Mississippi area.[2]

### I. Facts

In 1972, Congress passed the Prevailing Rate System Act, Pub.L. No. 92–392, 86 Stat. 564 (1972) (codified at 5 U.S.C. §§ 5341–49 (1994 & Supp. III 1997)), which is part of the Federal Wage System (FWS), 5 U.S.C. §§ 5301, et seq. (1994 & Supp. III 1997). Under this enabling legislation, the wages of federal blue collar employees were to be set relative to prevailing rates for comparable work in the private sector within a local wage area. 5 U.S.C. §§ 5341, 5343. In addition, this legislation provides, in pertinent part:

> It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and be based on principles that—
>
> (1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;
>
> (2) there will be relative differences in pay within a local wage area when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions; . . . .

5 U.S.C. § 5341. *See generally, United States v. Clark,* 454 U.S. 555, 557, 102 S.Ct. 805, 70 L.Ed.2d 768 (1982).

Wage schedules under the FWS are established by the lead agency for a wage area. The lead agency for the Northern Mississippi, Jackson and Memphis wage areas is the Department of Defense. Although the Office of Personnel Management (OPM), with the advice of the Federal Prevailing Rate Advisory Committee (FPRAC), prescribes the policies and procedures for conducting wage surveys under the FWS, OPM does not itself conduct local wage surveys. Rather, under the established procedures, the lead agency creates a local wage survey committee, which conducts hearings at which interested organizations and individuals may appear to present information, requests, and recommendations pertaining to the conduct of the survey. The local wage survey committee then prepares a report to the lead agency offering any recommendations it has, including changes in the geographic coverage of the wage area. The lead agency then submits its recommendations to the FPRAC, which, in turn, evaluates them and makes it own recommendations to OPM. OPM then defines the boundaries of wage areas. See 5 C.F.R. § 532.231.

### A. The Reservoir Claim

To the south of Memphis, there are a number of reservoirs managed by the Corps, each of which is located in relative proximity to a major north-south highway, Interstate 55. Plaintiffs Joey Capwell, Willie J. Davis, Earl Echols, Eddie J. Ford, John H. Ford, David Hall, Reuben James, Thomas T. Mangum, Eddie McDonald, and Wayne Sanders are current or former prevailing wage employees of the Corps at these reservoirs. Messrs. Capwell, Davis, Echols, E. Ford, J. Ford, Hall and Magnum are or were stationed at the Enid Reservoir in Yalobusha County, Mississippi. (See accompanying county map). Messrs. James and McDonald are employed at the Grenada Reservoir,

---

1. This claim will hereinafter sometimes be referred to as the "Reservoir claim" and the plaintiffs with respect thereto as the "Reservoir plaintiffs."

2. This claim will hereinafter sometimes be referred to as the "Turner claim."

Counties

Boundaries as of January 1, 1990

SCALE

U.S. DEPARTMENT OF COMMERCE  Economics and Statistics Administration  Bureau of the Census

MAPS

MISSISSIPPI · G-1

Grenada County, Mississippi, a county south of Yalobusha. Both the Enid and Grenada reservoir workers are paid based on the Northern Mississippi survey area.[3]

There are several other Corps reservoirs located within counties that lie south of Memphis, but north of Yalobusha and Grenada counties. The Sardis Reservoir is located in Panola County, Mississippi, which is due north of Yalobusha County. Like the workers at Enid and Grenada, the workers at Sardis are paid based on the Northern Mississippi survey area. While some of the Reservoir plaintiffs live in Panola County, none

3. Prior to March 1996, the Northern Mississippi survey area was called the Columbus–Aberdeen survey area. *See* 61 Fed.Reg. 10879 (1996) (codified at 5 C.F.R. pt. 532 (1999)).

of them work there. To the north of Panola County, lies Tate County, Mississippi, in which the Arkabutla Reservoir is located. The workers at Arkabutla are paid according to the rates of the Memphis, Tennessee survey area.

In defining wage area boundaries, OPM considers the following three regulatory criteria: (i) distance, transportation facilities, and geographic features; (ii) commuting patterns; and (iii) similarities in overall population, employment, and the kinds and sizes of private industrial establishments. 5 C.F.R. § 532.211. On three separate occasions, in 1972, 1979 and 1983, the FPRAC considered whether to redefine the Northern Mississippi survey area and, more specifically, whether to add Panola and Yalobusha Counties to the Memphis survey area. After one of these reviews, OPM included several Mississippi counties that border Tennessee in the Memphis survey area, including Benton, Desoto, Marshall, Tate, Tippah and Tunica.

In 1995, following the filing of the complaint here, the FPRAC reviewed the scheme of the Northern Mississippi wage survey area. It specifically considered plaintiffs' request to include the counties of Panola and Yalobusha·in the Memphis wage survey area. The FPRAC, however, found no "compelling evidence" to make this change and recommended as such to OPM. In explaining its recommendation as to Yalobusha, the FPRAC stated:

> Distance to the closest city and industry and population criteria favor the Columbus–Aberdeen [Northern Mississippi] wage area more than the Memphis wage area. Commuting patterns slightly favor the Columbus–Aberdeen wage area. Distance to the closest host installation favors the Memphis wage area. Transportation facilities and geographic features criteria are indeterminate. Based on the mixed nature of the regulatory analysis findings, there is no compelling reason to redefine Yalobusha County to another wage area.

Based on the "mixed nature of the regulatory analysis findings," the FPRAC also declined to alter the wage treatment of Panola County. On March 18, 1996, OPM adopted the FPRAC recommendation. 61 Fed.Reg. 10879 (1996) (codified at 5 C.F.R. pt. 532 (1996)).

The reservoir plaintiffs challenge the decision by the Army Corps to designate Yalobusha and Grenada Counties part of the Northern Mississippi wage area as opposed to the generally higher paying Memphis, Tennessee, wage area. These plaintiffs contend that OPM's definition of the Northern Mississippi wage area is unsupported by substantial evidence and violates the pay policies of the FWS.

**B. The Turner Claim**

Zedric Turner is stationed at the Corps "floating plant" at Greenville, Mississippi.[4] When Mr. Turner began working for the Corps in 1971, as a floating plant employee in the Mat Loading Unit, he was paid based on the wage rates of the Jackson, Mississippi survey area. As a floating plant employee, Mr. Turner worked along the Mississippi River and was paid the Jackson rate because the then district headquarters, Vicksburg, Mississippi, was located within that survey area.

In 1980, the Corps offered Mr. Turner a position as a permanently-stationed floating plant employee in Greenville, Mississippi. A letter dated September 5, 1980, from the Corps to Mr. Turner explained the rationale for this offer, as follows:

> Your current hourly rate of pay was fixed under the Jackson, Mississippi, Wage Rate Schedule based on the requirement that you accompany the Mat Loading Unit to various work sites along the Mississippi River and its tributaries during the revetment season. Since there is no longer a requirement for employees assigned the Material Handling & Fleet Security to accompany the Mat Loading Unit to these river work sites, the hourly rate of pay for the position you occupy will be governed by the Columbus–Aberdeen Wage Rate

---

**4.** A "floating plant" is essentially a vessel used to conduct construction, maintenance or manufac- turing.

Schedule which is applicable to all wage grade positions permanently stationed in Greenville, Mississippi.

Although informed that the change would shift him to a lower pay scale, Mr. Turner accepted the offer and the Corps switched him to the Northern Mississippi survey area.

As a result of this change, in 1980, there were at least two separate special wage rate schedules in effect for employees working on floating plants in Greenville. One schedule covered employees assigned to three large floating plants working at numerous points along the Mississippi River on a seasonal basis of three to four months a year. These employees, when not working on the river during the remaining seven or eight months of the year, were permanently stationed in either Vicksburg or Greenville. The other schedule covered Mr. Turner, who did not travel with the Mat Loading Unit Floating Plan operation during the construction season. The effect of these two schedules was that for seven to eight months a year, employees working at the same location, Greenville, and allegedly doing the same jobs, were paid different amounts.

Beginning in 1988, the Corps sought assistance from the Department of Defense Wage Fixing Authority (DODWFA) in having all floating plant employees, whether permanently-stationed or not, paid according to the district headquarters' wage survey area. DODWFA denied the request. The Corps ultimately petitioned the FPRAC to change its Federal Personnel Manual policy. The FPRAC agreed and on May 26, 1992, OPM authorized the change. On July 12, 1992, Corps officials implemented this change, taking permanently stationed Greenville employees, including Mr. Turner, out of the Greenville pay scale, and placing those employees on the Jackson, Mississippi pay scale. On May 15, 1994, the Corps placed the floating plant workers stationed in Greenville under the direction of the Memphis District, and workers began receiving their pay based upon the Memphis wage schedule. This new placement did not result in a job description change for Mr. Turner.

## C. Procedural History

On March 10, 1993, Mr. Turner filed a complaint in the United States District Court for the Northern District of Mississippi seeking back pay. On February 4, 1994, the complaint was transferred to this court. The first amended complaint was filed on May 18, 1994, adding the other plaintiffs. On November 4, 1994, plaintiffs filed a second amended complaint seeking back pay and alleging: (i) the Reservoir plaintiffs were improperly paid according to the Northern Mississippi survey area, rather than the Memphis, Tennessee area; and (ii) Mr. Turner was improperly paid according to the Northern Mississippi survey area rather than the survey area of his district headquarters.[5] Summary judgment motions were filed in this case in 1998. The case was transferred to this judge on February 4, 1999.

## II. Discussion

Plaintiffs have alleged that the Corps acted in violation of the Federal Wage System, 5 U.S.C. §§ 5341, et seq. As discussed above, the FWS establishes the administration of pay for certain skilled employees of the federal government. Because the FWS mandates the payment of money, this court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491. *Bosco v. United States,* 931 F.2d 879, 882 (Fed.Cir.1991).

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that are not outcome-determinative under the governing law will not preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could

---

5. The plaintiffs have agreed to forego the portion of their claims that is barred by the six-year statute of limitations. 28 U.S.C. § 2501 (1994).

return a verdict for the nonmoving party." *Id. See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *California ex rel. Dept. of Transp. v. United States,* 27 Fed.Cl. 130, 135 (1992), *aff'd,* 11 F.3d 1071, 1993 WL 410284 (Fed.Cir.1993). When reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. *See also Agosto v. INS,* 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

▮ To have a court set aside the determinations of federal agencies in prevailing rate disputes, a plaintiff must show that there has been an abuse of discretion, or that such a determination is so arbitrary as to be clearly wrong. *Adams v. United States,* 810 F.2d 1142, 1144 (Fed.Cir.1987) (*citing National Maritime Union v. United States,* 231 Ct.Cl. 59, 682 F.2d 944, 955 (Fed.Cir.1982)); *Best v. United States,* 14 Cl.Ct. 720, 725 (1988).[6] Plaintiffs in such cases "bear a heavy burden of proof, for the congressional

grant of administrative discretion is broad and our scope of review narrow." *Best,* 14 Cl.Ct. at 725. *Compare Anderson v. Hodel,* 899 F.2d 766, 770 (9th Cir.1990) (holding that the validity of a wage survey hinged on whether the agencies involved complied with the applicable statutes and regulations).

**A. Reservoir Claim**

The Federal Wage System is the pay system under which Federal employees in craft, trade and laboring positions are paid. The pay for these employees is governed by a series of statutory provisions, known collectively as the prevailing rate system. Among these provisions is one which states that "there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area." 5 U.S.C. § 5341(1). The purpose of this statute is "to prevent interagency discrepancies in wages among employees who are working under similar conditions of employment in all agencies within the same local wage areas." *Best,* 14 Cl.Ct. at 725. *See also* S.Rep. No. 92–791 at 2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2980, 2981–82; 118 Cong. Rec. 21017 (1972) (remarks of Sen. McGee); *National Maritime Union v. United States,* 682 F.2d at 948, 955; *Baratt v. United States,* 218 Ct.Cl. 242, 585 F.2d 1041, 1045–47 (1978).

The Reservoir plaintiffs contend that, when the boundaries of the Memphis wage area were redefined to include the five Northernmost counties of Mississippi, the counties of Panola, Yalobusha and Grenada, to the south of these counties, should also have been included in that wage area, rather than remaining in the Northern Mississippi wage area.[7] They argue that the OPM and

---

**6.** Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful,

the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48(Fed.Cir.1989); *Blount, Inc. v. United States,* 22 Cl.Ct. 221, 227 & n. 7 (1990).

**7.** Although plaintiffs have made arguments with respect to Panola County, the record reflects that none of them work there.

the other agencies involved here arbitrarily misapplied the three criteria in 5 C.F.R. § 532.211, used in determining the boundaries of wage areas. They also argue that OPM should have considered other information, in particular, the economic impact of Interstate 55, which connects the affected counties to Memphis, in deciding whether the counties belonged in the Memphis wage area.

■ The arbitrary and capricious standard applicable to this case is often said to have two prongs: (i) whether there was a "consideration of the relevant factors;" and (ii) whether "there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[8] The Supreme Court burnished these requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), when it identified four grounds upon which a holding of arbitrary or capricious agency action could be based. It ruled that an agency action would be "arbitrary and capricious:"

> [If] the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856. *See also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 645, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); *Hines v. Secretary of HHS*, 940 F.2d 1518, 1527–28 (Fed.Cir.1991). Subsequent courts have summarized the holdings in *Overton Park* and *State Farm* as stating that "the essential function of judicial review" in the arbitrary and capricious context "is to ensure that the agency is engaged in 'reasoned decisionmaking.'" *United States v. Garner*, 767 F.2d 104, 116 (5th Cir.1985) (quoting *Int'l Bthhd. of Teamsters v. United States*, 735 F.2d 1525, 1531 (D.C.Cir.1984)).

■ In the instant case, plaintiffs do not claim that the agencies considered factors that the Congress had not intended them to consider. Rather, they contend that the agencies failed to consider an important element of the analysis—namely, the impact of Interstate 55 in connecting Yalobusha and Grenada Counties to Memphis. They assert that the interstate effectively links the affected counties to the Memphis economy. However, while the FPRAC did not specifically refer to the interstate in its findings, it did consider factors that reflected that impact, to the extent it existed. For example, OPM found that only 2 percent of the Yalobusha County workforce commutes to work in the Memphis area, while 78 percent of the workforce commutes to work in Yalobusha or other counties in the Northern Mississippi wage area. In addition, OPM found that the population of Yalobusha, as well as the number of individuals employed in manufacturing, transportation, communications, utilities and wholesale trade, tracked the comparable figures for counties in the Northern Mississippi region not located along Interstate 55.[9] These statistics not only reflect that OPM effectively considered the impact of the interstate in deciding whether Yalobusha should be part of the Memphis area, but also support OPM's conclusion that Yalobusha belonged in the Northern Mississippi region.

Contrary to plaintiffs' claims, other evidence considered by FPRAC supported its conclusion that Yalobusha county should remain in the Northern Mississippi region. For example, the FPRAC compared the dis-

---

8. *See also Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *American Paper Inst. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 412–13, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983); *Texas Crushed Stone Co. v. United States*, 35 F.3d 1535, 1539–40 (Fed. Cir.1994).

9. Thus, for example, the total population in Yalobusha County of 12,033 was less than the popula-

tions in three nearby Northern Mississippi wage area counties not located along the interstate—Tallahatchie (15,210), Bolivar (41,895) and Coahoma (31,665). Yalobusha also had less workforce dedicated to manufacturing, transportation, communications, utilities and wholesale trade than Bolivar and Coahoma counties (although it had more such employees than Tallahatchie).

tribution in Yalobusha of private sector employment in manufacturing, transportation and public utilities, and wholesale trade to the distribution in the Northern Mississippi and Memphis wage areas. The following chart indicates that those figures supported keeping Yalobusha in the Northern Mississippi region:

PERCENTAGE OF
SURVEYABLE
EMPLOYMENT IN:

| | MANUFACTURING | TRANSPORTATION AND PUBLIC UTILITIES | WHOLESALE TRADE |
|---|---|---|---|
| YALOBUSHA COUNTY | 87% | 7% | 6% |
| NORTHERN MISSISSIPPI | 81% | 8% | 11% |
| MEMPHIS | 40% | 32% | 28% |

Based on these statistics, as well as the statistics cited above, it appears that the FPRAC recommendation derived from a process that considered all relevant factors and was supported by substantial evidence.

Moreover, it is telling that plaintiffs have provided virtually no evidence to support their contentions regarding the economic impact of Interstate 55. Although discovery has already occurred in this case, the plaintiffs have neither obtained nor conducted any type of statistical studies to counter the surveys conducted by FPRAC. Rather, they rely upon their own affidavits, which, at best, provide only anecdotal information of their own economic ties to Memphis (*e.g.*, the fact that they shop in Memphis and use the hospitals there). These bald observations and conclusory statements, albeit embellished by similar assertions made by plaintiffs' counsel at oral argument, fall far short of the type and magnitude of competent evidence needed to establish that the determinations made by the FPRAC were arbitrary and capricious. More to the point, they do not create genuine issues of triable fact that would preclude entry of summary judgment for the government in this case. *See* RCFC 56(f) (opposing party "must set forth specific facts showing that there is a genuine issue for trial"). *See also Anderson,* 477 U.S. at 248–50, 106 S.Ct. 2505; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626–27 (Fed.Cir.1984) (stating that more is required than mere assertions of counsel to defeat a motion for summary judgment); *MacMurray v. United States,* 15 Cl.Ct. 323, 333 (1988) ("Bald allegations and conclusory statements, if unsupported by specific facts, do not create a genuine issue of fact"). Accordingly, as to the Reservoir claim, we must find that plaintiffs' submissions do not create a genuine issue of material fact for trial that would prevent this court from finding for defendant as a matter of law.

### B.   Turner Claim

Mr. Turner argues that the Corps acted arbitrarily in placing him on the Northern Mississippi wage scale, while leaving other floating plant employees who worked the majority of the year in Greenville on the Memphis scale. Mr. Turner alleges that as the result of this decision, for eight to nine months a year, employees doing the same job, working side-by-side in Greenville were paid different salaries. This discrepancy, he argues, violates the statutory requirement that "there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area." 5 U.S.C. § 5341(1).

Defendant, for its part, argues that Mr. Turner was not "working under similar conditions of employment" because unlike some of the other employees in Greenville, Mr. Turner did not travel the river for three to four months a year. As such, defendant

appears to contend that Mr. Turner's situation was governed by 5 U.S.C. § 5341(2), which provides that differences in pay within a local wage area may exist when "there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions." While admitting that, unlike his fellow employees, he did not travel the river, Mr. Turner disagrees with the defendant's assessment of the legal import of this factual distinction, suggesting that, at best, it supports paying the other employees an enhanced rate while they were on the river, but does not support paying these same employees a higher rate while they worked in Greenville. Mr. Turner, moreover, points out that, in 1992, the Corps managed to overlook the fact that he did not travel the river in putting him on the same pay scale as those employees who did travel it. In short, he asserts that the Corps has treated him in an arbitrary and capricious fashion.

As to Mr. Turner's claim, a number of genuine issues of material fact appear to exist that preclude the granting of summary judgment for either party. For example, defendant contests Mr. Turner's assertion that the employees who worked on the river did the same jobs as Mr. Turner during the time that they worked in Greenville. Moreover, the record is unclear as to the exact amount of additional compensation received by the Greenville employees who worked on the river and as to whether those employees received a per diem while away from Greenville to compensate them for the expenses associated with their travel. These figures

might shed light on the question whether the difference in compensation between Mr. Turner and the other employees in Greenville reasonably reflected the purported differences in their duties and responsibilities. Particularly unclear is the exact rationale that was relied upon by the Corps and the FPRAC in deciding, in 1980, to move Mr. Turner off the Jackson, Mississippi schedule and then, in 1992, without any real change in circumstances, to move him back onto that schedule. The answers to these factual questions bear, in turn, on the resolution of the ultimate question here—whether the Corps' interpretation of the relevant statutes and policies and its application of that interpretation to Mr. Turner were arbitrary and capricious.

Far from answering these questions, the materials supplied by defendant in support of its motion actually add to the confusion. For example, they disclose that in a 1992 proceeding before the FPRAC on this subject, a government representative on the committee admitted that the exception applied to Mr. Turner was inconsistent with the published rationale for the Corps wage schedules.[10]

Moreover, the record suggests at least two instances in which groups of Corps employees arguably similarly situated to Mr. Turner were not placed on a special schedule, but instead paid at the rate of the district headquarters. In one such instance, floating plant employees in southern Louisiana were apparently paid according to the New Orleans, Louisiana wage area, even though they were permanently assigned to a facility in the Lake Charles–Alexandria area.[11] In an-

10. Prior to 1996, the published rationale for the floating plant schedules, contained in Section B of Appendix V to FPM Supp. 532–1, stated:

Schedules are established identical to the regular Federal Wage System schedule for wage area in which the District Headquarters are located, except that when the floating plant operations are performed exclusively in a wage area other than the District headquarters wage area, the special schedule is established identical to the regular wage schedule for the wage area in which the floating plant operations are performed.

Commenting on this policy and its application to permanently stationed floating plant employees, a government representative to the FPRAC stated "[t]he real inconsistency in Appendix V between

the so-called policy statement or the section that is labeled 'basis for schedules' in the listing of the exceptions is a continuing problem and we do not see a simple resolution of it." He added that "[j]ust to repeat, the basic problem is that the 'basis for schedules' text in Appendix V and the listing of the areas in Appendix V don't mesh." Appendix V was modified in 1996 to provide, as to employees on floating plants, that "[s]chedules are established identical to the regular Federal Wage System schedule for the wage area in which the District headquarters is located."

11. This situation is particularly troubling as the record suggests that, in 1987, the employees in Louisiana wanted to be paid on the scale applicable to the area where they worked. The Comptroller General rejected this claim, in part, ap-

other instance, it appears that Corps lock and dam employees, who worked at fixed facilities in one wage area, were instead paid at the higher wages associated with the district headquarters.[12] While defendant argues that these situations are distinguishable, genuine issues of material fact appear to exist as to whether the Corps, in fact, has acted consistently in setting the wages of its employees at fixed locations.

Thus, as to Mr. Turner's claim, plaintiffs have demonstrated a number of issues of material fact still in dispute that prevent this court, at this point, from finding in favor of either party.

### III. Conclusion

In sum, based on the foregoing, the court concludes that defendant is entitled to summary judgment on the Reservoir claim, but that the Turner claim is not resolvable absent trial. Accordingly, defendant's motion for summary judgment is GRANTED, IN PART, and DENIED, IN PART. Plaintiff's motion for summary judgment is DENIED.

parently based on the objections of the Corps. Regarding those objections, the Comptroller's decision describes:

> The Corps Headquarters in Washington, D.C., responded that it could not support these requests for implementation of a special schedule. It stated that the language of Section B, Appendix V of FPM Supplement 532–1 had been misinterpreted because exceptions to the practice of establishing schedules identical to the regular Federal Wage System schedule for the wage area in which a District Headquarters is located are permitted only when the entire floating plant operations of a District are performed exclusively in a wage area other than the District headquarters wage area. The Washington Headquarters stated that this in-

terpretation had been implemented through Corps actual practices for 25 years.

As described by the Comptroller, the position of the Corps in the New Orleans matter appears inconsistent with the position it took with respect to Greenville. Whether this is truly the case is a matter for further development at trial.

12. As reflected in the record, the Corps policy for lock and dam employees stated that:

> If navigation lock and dam installations under a District Headquarters office are located in more than one FWS wage area, the operating and repair employees are paid from a special schedule having rates identical to the regular FWS wage schedule authorized for the headquarters office.