**PALM BEACH ISLES ASSOCIATES,**
a Florida Partnership, et al.,
Plaintiffs,

v.

**UNITED STATES, Defendant.**

No. 93–654L.

United States Court of Federal Claims.

Dec. 5, 2003.

Luther M. Taylor, Palm Beach Gardens, Florida and Michael J. Ryan, Tequesta, Florida, for the plaintiffs.

Susan V. Cook, General Litigation Section, Environmental & Natural Resources Division and John C. Cruden, Acting Assistant Attorney General, United States Department of Justice, for the defendant. Scott Park, General Litigation Section, Environmental & Natural Resources Division, and Martin R. Cohen and Dorothy L. Boardman, United States Army Corps of Engineers, of counsel.

## OPINION

HORN, Judge.

## BACKGROUND

This is a regulatory takings case, based on the refusal of the United States Army Corps of Engineers (the Corps) to issue a permit to dredge and fill the plaintiffs' property for development. This court rendered an earlier opinion, denying plaintiffs' motion for summary judgment on their regulatory takings claim, and granting the defendant's cross-motion for summary judgment. *Palm Beach Isles Assocs. v. United States*, 42 Fed.Cl. 340, 365 (1998). This earlier opinion found that 49.3 acres of the plaintiffs' property was below the mean high water mark of Lake Worth, Florida and impacted by the federal navigational servitude. Therefore, this court found no compensable Fifth Amendment taking. Furthermore, plaintiffs were not found to have had reasonable investment-backed expectations for the adjoining 1.4 acres along the shoreline of Lake Worth, considering the plaintiffs' total parcel, which consisted of the 1.4 acres, the adjoining 49.3 submerged acres and another adjoining 261 acre oceanfront portion of the parcel. The 261 acre portion was sold separately by plaintiffs for a substantial gain. *Id.*

On appeal, in its first opinion, the United States Court of Appeals for the Federal Circuit vacated and remanded the case, having determined that summary judgment was in-appropriate due to a genuine issue of material fact regarding the applicability of the federal navigational servitude. *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1377 (Fed.Cir.2000). The Federal Circuit stated that Lake Worth is part of the Atlantic Intracoastal Waterway (ICW), which is navigable water, such that the submerged 49.3 acre portion of plaintiffs' property "lies in the bed of a navigable water of the United States." *Id.* The Federal Circuit also cited the Rivers and Harbors Act of 1899 (codified at 33 U.S.C. §§ 401—467 (1994 & Supp. Ill 1997)), as requiring that any entity desiring to dredge and fill a navigable water of the United States first must obtain a permit to do so from the Corps. *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1377 (specifically citing section 10 of the Rivers and Harbors Act, codified at 33 U.S.C. § 403 (1994)). In 1957, plaintiffs had obtained from the Corps the necessary permit to dredge and fill the property in question. The permit was extended in 1960, but expired unused in 1963. *Id.*

The Federal Circuit also noted that, in 1972, Congress enacted the Clean Water Act (codified at 33 U.S.C. §§ 1251–1376 (1994 & Supp. Ill 1997)). Section 404 of the Clean Water Act (codified at 33 U.S.C. § 1344 (1994)), also requires a permit from the Corps for dredging and filling navigable waters of the United States, and requires that environmental concerns be taken into consideration in issuing a permit. *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1378.

In 1988, as required by state law, plaintiffs applied to the Florida State Department of Environment Regulation for a permit to dredge and fill the submerged 49.3 acres and the 1.4 acre shoreline wetlands. The State of Florida denied the permit on environmental grounds, plaintiffs sued, and a subsequent settlement removed this state obstacle to property development. The Federal Circuit noted that:

> In Florida, title to the beds of navigable waterbodies is held by the state in public trust; the Trustees of the Internal Improvement Fund administer the trust, and

in general have power to convey submerged lands to private owners if the sale is not contrary to the public interest. In the early years of Florida's development, much of the States's sovereignty land was so conveyed.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1378 n. 2. The settlement between the State of Florida and plaintiffs acknowledged that, pursuant to the terms of the deed from the Trustees of the Internal Improvement Fund, plaintiffs had the legal right to dredge and fill the 49.3 submerged acres, at least at far as the State of Florida was concerned. *Id.* at 1378.

On May 31, 1989 plaintiffs applied to the Corps for a permit pursuant to section 10 of the Rivers and Harbors Act and section 404 of the Clean Water Act. After review, on May 16, 1990, the Corps denied plaintiffs' application for a permit. As to the basis for the denial, the Federal Circuit stated: "The Corps' denial letter made clear that the denial was primarily predicated on environmental grounds and the requirements of the Clean Water Act," but the permit denial also addressed the impact of the proposed project on navigation. *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1378.

In its analysis, the Federal Circuit first identified the proper parcel for review. A 311.7 acre parcel had been purchased by plaintiffs in 1956, and 261 acres of this parcel were sold in 1968 for a substantial gain, leaving the 49.3 acres of lake bottom and adjoining 1.4 acres along the shoreline. The Federal Circuit determined that the proper parcel for review was not the 311.7 acres, but only the unsold remainder of 50.7 acres (49.3 acres plus 1.4 acres). The Federal Circuit concluded that:

> Once the proper parcel is defined as the 50.7 acres, it becomes clear that, without the dredge and fill permits, the entire 50.7 acres, including the 1.4 acres of wetlands, have no or minimal value. Thus, the facts are uncontrovertible that the permit denial has the effect of denying the property owner *all* economically viable use of the property, and, since the State has stipulated that the property owner under state law has the right to dredge and fill, the

denial by the Corps of the permits constitutes a categorical taking of the 50.7 acres by the Federal Government.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1381 (emphasis in original; footnote omitted).

The Federal Circuit also concluded that the submerged 49.3 acres was subject to the federal navigational servitude, and that navigational servitude may serve as a defense to a regulatory taking. *Id.* at 1382–84. "[T]he Government must show that the regulatory imposition was for a purpose related to navigation .... In the present case, we are unable to determine whether the Government has made a sufficient showing of a navigational purpose behind the permit denial." *Id.* at 1385. By way of example, the Federal Circuit noted that the Memorandum accompanying the Corps' permit denial letter (the Corps' Statement of Finding) stated that granting the permit would result in "the elimination of [49.3] acres of navigable waters," but also stated that "the project should not have a significant adverse impact on navigation, in general." *Id.* at 1386 (alteration in original). The Federal Circuit viewed the Corps' language as contradictory, and concluded that "the issue of whether the Government had a navigational purpose for its permit denial is a disputed material fact," remanding the issue to this court. *Id.* Under the Federal Circuit's analysis, if the government cannot demonstrate that one of the grounds for denying the permit was the federal navigational servitude, the government's defense fails. On the other hand, if the government can demonstrate a navigational purpose behind the permit denial, then there is no compensable taking of the 49.3 acres of lake bottom. *Id.*

The government filed a combined petition for rehearing by the Federal Circuit panel, and also for rehearing by the Federal Circuit *en banc. See Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir. 2000). The government's petition for rehearing by the panel was granted, with the Federal Circuit's Order stemming from the panel rehearing considered to be an addendum to the panel's original opinion. *Id.* at 1358. The petition for rehearing *en banc* was de-

nied. *See Palm Beach Isles Assocs. v. United States,* 231 F.3d 1365 (Fed.Cir.2000) (Gajarsa, J., dissenting).

The Federal Circuit Order on the petition for rehearing noted that the 1.4 acres are not submerged property potentially subject to the federal navigational servitude defense, and, therefore, should be analyzed separately:

> On further review, then, we conclude that the proper disposition of the issue regarding the 1.4 acres is to remand the question of a taking to the trial court. If the trial court determines that the permit denial constituted a categorical taking of the 1.4 acre tract, then, absent any other defenses the Government may have, PBIA is entitled to compensation as if it were a physical taking for government purposes. If the trial court determines that, on the facts, the permit denial constituted less than a total wipeout of economically viable use, the court must then determine if there is a partial taking, applying the *Penn Central*[1] criteria (as modified by *Lucas*[2]—see this court's explanation in *Loveladies Harbor;*[3] *see also Florida Rock*).[4]

*Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1365. After additional discovery, a hearing and site visit were held on the remand issues, and the parties submitted post-hearing briefs for review. Plaintiffs subsequently moved to supplement the record. The court granted the plaintiffs' motion, and supplemental post-hearing memoranda were received from the parties.

## FINDINGS OF FACT

The property in dispute consists of a 50.7 acre parcel of land located in the City of Riviera Beach, Palm Beach County, Florida. Of the 50.7 acres, 49.3 acres consists of lake bottom along the eastern shoreline of Lake Worth, Florida. The remaining 1.4 acres is a narrow strip of land running along the east-

ern shoreline of Lake Worth and adjoining the submerged 49.3 acres. Lake Worth itself is a long, narrow lake lying in a north to south configuration. An artificial inlet connects Lake Worth to the Atlantic Ocean. Lake Worth serves as a segment of the Atlantic Intracoastal Waterway, which consists of "[t]wo inland water routes approximately paralleling the Atlantic coast between Norfolk, Virginia, and Miami, Florida, for 1,192 miles . . . ." 33 U.S.C. § 1804(6) (2000).

On May 31, 1989, the Corps received a permit application from plaintiffs pursuant to section 10 of the Rivers and Harbors Act of 1899, codified at 33 U.S.C. § 403, and section 404 of the Clean Water Act, codified at 33 U.S.C. § 1344. The application sought permission to fill the 49.3 acres of lake bottom and 1.4 acres along the adjoining shoreline, for the purpose of constructing a residential housing development.

Plaintiffs' permit application (Department of Army Permit Application No. 89IPD–90481) was assigned for processing to Donald Borda, a project manager in the Jacksonville, Florida District Office of the Corps of Engineers. In processing the permit application, the Corps completed an environmental assessment, issued a public notice for comment, and received comments from a number of other governmental agencies. The Environmental Protection Agency, the Fish and Wildlife Service, and the National Marine Fisheries Service recommended that the permit be denied. The City of Riviera Beach, Florida, in a letter to the Corps, stated that it "strongly oppos[es] such a request to fill approximately 50 acres of submerged lake bottom in Lake Worth." The Board of County Commissioners, Palm Beach County, passed a resolution declaring that the filling of fifty acres of seagrass habitat would be contrary to the public interest. The Corps transmitted the comments it had received to

---

1. *Penn Central Transportation Company v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

2. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

3. *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.), *reh'g and rehearing en banc denied* (1994).

4. *Florida Rock Industries, Inc. v. United States,* 18 F.3d 1560 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

Palm Beach Isles on January 12, 1990, and invited its response to the concerns identified.

The plaintiffs responded to the comments and concerns on February 8, 1990. As to the concerns raised by the Palm Beach County Department of Environmental Resources Management, the City of Riviera Beach, Department of Community Development and Environmental Control, and other groups and federal agencies, the plaintiffs acknowledged that "the construction of the proposed project will result in the loss of a natural resource from which the public currently benefits." Plaintiffs also stated that the "[c]ompensating public benefit however is derived from an increase in the tax base." In addition, plaintiffs replied to the numerous public interest concerns by emphasizing that zoning for the property only allows "single family residential" land use and not "water dependant uses such as marinas." The plaintiffs also emphasized that "the subject property comprises the extent of the applicant's holdings. No other site is available to the applicant for the proposed use or alternative uses." In closing, plaintiffs stated that "[t]he site plan finally selected represented the most favorable balance of impacts on the environment vs. economic return to the applicant."

The Corps denied Palm Beach Isle's permit application on May 16, 1990. The cover letter accompanying the denial by the Corps stated:

> The evaluation of your proposal has been completed and it has been deter-

mined that the issuance of the permit is contrary to the 404(b)(1) [5] guidelines and contrary to the public interest. The project would result in the elimination of 50.7 acres of important Lake Worth shallow water habitat.

> Based on the evaluation of all pertinent facts in the file, the permit to fill 50.7 acres of Lake Worth shallow water habitat is hereby denied.

The permit denial addressed a number of factors, including economics, environmental concerns, wetlands, fish and wildlife, flood hazards, flood plain, land use, shore erosion and accretion, recreation, water supply and conservation, water quality and safety, as well as navigation. In addressing the impact of the proposed development upon navigation, the Corps stated:

> (11) Navigation: Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of 48.4 acres [6] of navigable waters, the project should not have a significant adverse impact on navigation, in general.

In a related comment, the Corps also stated that:

> (13) Recreation: The proposed project would eliminate an open water area of 48.4 acres currently utilized by recreational (as well as commercial) fishermen and boating enthusiasts, not to mention the scores of residents, educators, students, bird-watch-

---

5. Section 404(b)(1) of the Clean Water Act, codified at 33 U.S.C. § 1344(b)(1).

6. The cited figure of "48.4 acres" was used in the Corps' May 16, 1990 Statement of Finding supporting the permit denial. Different figures have been used to describe the acreage at issue. Prior to the hearing, the parties had stipulated that the figure for the lake bottom acreage was "49.3 acres," and the figure for the adjoining acreage along the shoreline was "1.4 acres." At the hearing, defendant introduced a survey prepared by Brown & Phillips, Inc., Professional Surveying Services, indicating that the lake bottom area was "39.03 acres, approximately," and that the previously identified adjoining "1.4 acres" along the shoreline was approximately "1.02 acres," for a total of 40.05 acres. The record reflects that plaintiffs have variously estimated the lake

bottom and shoreline acreage together at "approximately 40 acres"; "40.7 acres"; and "somewhere in the area of 40 plus acres." However, one of the plaintiffs' witnesses, Martin Gauthier, an engineer who processed the permit application for the plaintiffs, stated that the western boundary of the submerged parcel has never been clearly established, which would be required for a definitive survey. Plaintiffs' supplemental post-hearing memorandum referred to the submerged land as "40 plus acres," and the upland as the "1.02 acre" parcel. In the face of the differing estimates, for purposes of this opinion, the court will refer to the size of the parcels as jointly stipulated to by the parties—49.3 acres of lake bottom, and 1.4 adjoining acres along the shoreline, for a total of 50.7 acres.

ers, and others who enjoy the fish, wildlife, and flora resources of the area.

Donald Borda, the project manager who processed the plaintiffs' permit application, in a declaration dated December 21, 1994, attempted to clarify the Corps' statement on navigability which accompanied the May 16, 1990 permit denial:

> On pages 12 and 13,[7] Item (11), Navigation, I state, "Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of 49.4[8] acres of navigable waters, the project should not have a significant adverse impact on navigation, in general." It is important to clarify that I was referring, there, solely to navigation in the broad sense of the commercial or recreational vessels that utilize the adjacent federal navigation channel (Intracoastal Waterway) and that travel in deeper waters. While the proposed fill might not have a significant adverse effect upon the ability of such vessels to move in the federal channel (although it could cause some shoaling of the channel and/or changes in quantity, quality, and direction of flow of the waters), the proposed fill would certainly have an adverse effect on shallow draft vessels that utilize the shallower areas by eliminating over 49 acres of these shallows and by altering the course, location, condition, and capacity of [the] entire waterbody.

The aforementioned statement at pages 12 and 13, Item (11), Navigation, should not be interpreted to mean that the proposed filling would not have a significant adverse impact on "navigable waters of the United States" under § 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, as defined in 33 C.F.R. Part 329. The fill would, without doubt, have a significant adverse affect [sic] upon the entire waterbody by altering or modifying the course, location, condition, or capacity of the lake and the navigation channel, in violation [of] RHA § 10. This is one of the principal reasons the permit was denied.

At the hearing, during direct examination, Mr. Borda was asked again what he meant by the statement in the Corps' Statement of Finding, that: "The project should not have a significant adverse impact on navigation in general." Mr. Borda responded, "I meant that it [the proposed project] would not have an adverse impact upon vessels, deep draft vessels, actually using the Federal channel [the Atlantic Intercoastal Waterway]." Mr. Borda added: "There was information that was received through the public notice comments about the area being used by recreational boaters, by fishermen, by local universities for marine studies, and this paragraph relates to that by showing that it would eliminate this open water area of 48.4 acres that were currently used by those interests." On cross-examination, Mr. Borda stated that, "what I was referring to was that it was very obvious that a fill, which I considered to be very massive and significant, of 48.4 acres did in fact have an adverse effect on the navigable capacity of navigable waters of the United States, but it did not have a significant adverse impact on the deep draft vessels traveling within the intercoastal waterway channel." Finally, Mr. Borda stated during cross-examination that "there were two principal reasons that the permit was denied, and that was because of navigation and because of environmental reasons. So it was certainly twofold."

At the time of the permit denial, John Adams was the Chief of the Regulatory Division, United States Army Corps of Engineers, Jacksonville District. At the hearing, Mr. Adams testified that he performed a supervisory review of the recommendation to deny plaintiffs' request for a permit, and that: "It [the federal navigation purpose]

---

**7.** The reference to pages 12 and 13 is to the "Department of the Army Environmental Assessment and Statement of Finding for Above–Numbered Permit Application" (Statement of Finding), dated May 16, 1990, a document prepared by Donald Borda, Senior Project Manager; reviewed by Bertil A. Heimer, Chief, South Permits Branch; and approved by Colonel Bruce A. Malson, the Corps District Engineer.

**8.** The figure actually used on page 13 of the May 16, 1990 Memorandum was 48.4 acres, rather than 49.4 acres stated here. *See* note 6, *supra.*

was one of the factors in the consideration of the overall permit application, that nearly 50 acres of open water was being completely eliminated, thereby [affecting] the course, condition and capacity of navigable waters of the United States. . . . In my view, the elimination of 48.4 acres of navigable waters absolutely impacts the capacity of navigable waters."

Mr. Adams acknowledged that a permit to dredge and fill the 49.3 submerged acres at issue was requested by plaintiffs on October 17, 1956, that navigable capacity would have been considered before issuance of a permit in 1956, and that the requested permit was approved on July 26, 1957. The 1957 permit contained a preamble, "express[ing] the assent of the of the Federal Government so far as concerns the public rights of navigation." Mr. Adams also acknowledged that the changes in the Corps' review of such permit applications, which occurred between 1957, when the first permit was granted, and 1989, when the permit at issue in this case was denied, were changes having to do with environmental concerns, not navigational concerns.

One of plaintiffs' witnesses at the hearing, Braxton Kyzer, a professional engineer, had retired from the Army Corps of Engineers. The court qualified Mr. Kyzer as an expert on the impact of proposed projects on navigation. Mr. Kyzer reviewed the permit denial file in the present case, made a site visit, and gave his opinion that the proposed project at issue would not have had an adverse impact on navigation—that the permit to dredge and fill was denied for environmental reasons rather than navigation reasons. Mr. Kyzer stated that his review of the Corps' Statement of Finding supporting the permit denial indicated that the public comments, the issues the permit applicant was asked to address, and the Corps' findings and conclusions concerned primarily environmental matters and not navigation matters. Mr. Kyzer stated that he defined navigable capacity as the ability of an intercoastal waterway channel to serve commercial navigation.

Another witness for the plaintiffs, H. Wayne Beam, has a doctorate in environmental sciences, and was qualified as an expert in navigation and environmental affairs. After a review of the permit file at issue, Dr. Beam testified that there was ample support in the permit file for the denial of the permit "on strictly environmental grounds." Dr. Beam further testified that he did not believe the plaintiffs' proposed development project would have an effect on commercial navigation, given the shallow depth of the submerged parcel.

Robert W. Higgins, a professional engineer who qualified as an expert in water resources and hydrology, also testified for the plaintiffs. Mr. Higgins stated that he submitted the permit application for the plaintiffs, that the Corps never raised any questions about navigation, that the water over the submerged parcel was shallow, about three to four feet in depth, and that he did not believe there would be any impact on navigation from the plaintiffs' proposed project. On cross-examination, Mr. Higgins was asked:

Q. Now how do you define navigation within the meaning in Section 10 [of the Rivers and Harbors Act]?

A. That it would be used for commercial and recreational purposes.

Q. And are you limiting that definition to navigation within a Federal project such as the intercoastal waterway or the Federal channel?

A. Not necessarily, no.

Q. So if it was possible that recreational boating could have taken place across this 40 or 50 acres of submerged land, then that water in your definition would be navigable?

A. Yes.

Q. So if in fact there was some evidence in the record when the Corps was processing the permit, I just want you to assume this, assume there is some evidence in the record when the Corps is processing the permit that this area is used by fishermen. If that's the set of facts in front of you, would you agree that the Corps would then have a navigational purpose in denying the permit under Section 10?

A. No.

Q. Why not?

A. Because that's not necessarily the only place where fishing could occur within Lake Worth. There's other suitable locations.

Q. So your definition then of impact upon commercial fishing under Section 10 is, that if a project is done at one location but you can still fish next door, you're not impacting navigation?

A. As long as there's not a demonstrated cumulative approval of those fill projects, correct.

Martin Gauthier, a professional engineer testifying for the plaintiffs, processed the permit application for the plaintiffs. Mr. Gauthier testified that none of the public comments on the permit application had to do with the impact of the proposed project on navigation, and that the Corps never asked plaintiffs to address possible negative impacts on navigation. In Mr. Gauthier's opinion, the plaintiffs' project would not have had an impact on navigation in Lake Worth. Mr. Gauthier acknowledged during cross-examination that the plaintiffs' project would have removed from the navigable capacity the acreage of the submerged land.

As for the 1.4 acre parcel along the shoreline of Lake Worth, Nathanial J. Orr, a real estate appraiser testifying for the plaintiffs, stated that he visited the parcel, concluded that the narrow strip of land could not be developed, and that "[t]he only possible use in my opinion would be to combine it with the land immediately west of it which was a total of about 50 acres of land, to develop the entire tract."

## DISCUSSION

*The Evidentiary Standard*

■ Defendant acknowledges that the Federal Circuit in its first *Palm Beach Isles* opinion placed the burden of proof on defendant to establish a defense based on the navigational servitude. In this regard, the Federal Circuit stated:

Thus it is clear that in order to assert a defense under the navigational servitude, the Government must show that the regulatory imposition was for a purpose related to navigation; absent such a showing, it will have failed to "identify background principles ... that prohibit the uses [the landowner] now intends." *Lucas [v. South Carolina Coastal Council,]* 505 U.S. at 1031, 112 S.Ct. at 2886.

In the present case, we are unable to determine whether the Government has made a sufficient showing of a navigational purpose behind the permit denial.

\*  \*  \*  \*  \*  \*

On remand, the Court of Federal Claims should determine whether the Government had bona fide navigational grounds for its permit denial. If so, the Government will have sustained its defense under *Lucas,* and there will be no taking. If, on the other hand, the Government cannot demonstrate that it denied the permit on navigational grounds, then its defense under the navigational servitude fails.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1385, 1386 (alteration and omission in original).

Plaintiffs argue that the defendant should be required to prove its navigable servitude defense with clear and convincing evidence, citing *A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020 (Fed.Cir.), *reh'g denied* (1992). The United States Court of Appeals for the Federal Circuit in *A.C. Aukerman* addressed which evidentiary standard to apply to the defenses of laches and equitable estoppel in a patent infringement case. *Id.* at 1044–46. The Federal Circuit noted that:

In civil cases litigants are generally required to prove facts by a preponderance of the evidence. *See* C. McCormick, *McCormick on Evidence* § 339 (2d ed.1972); 9 J. Wigmore, *Wigmore on Evidence* § 2498 (Chadbourn ed.1981). "[E]vidence preponderates when it is more convincing to the trier than the opposing evidence." *McCormick, supra,* at 793. The higher standard of "clear and convincing" proof is typically employed where the danger of deception is present (*e.g.,* establishing the terms of a lost will), where a particular claim is disfavored on policy grounds (*e.g.,* reformation or modification of a *written* contract), or where a

particularly important individual interest is at stake such as one's reputation (*e.g.*, fraud or undue influence). *Id.* at 797–98; *SSIH [Equip. S.A. v. United States Int'l Trade Comm'n]*, 718 F.2d [365,] 380–81, 218 USPQ [678,] 691 [(1983)].* The clear and convincing standard has also been imposed in some aspects of patent litigation by reason of the specific statutory provision that a patent is presumed valid. However, neither laches nor estoppel attacks a patent's validity.

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co,* 960 F.2d at 1045 (alteration and emphasis in original). The Federal Circuit then concluded in *A.C. Aukerman* that the normal preponderance of the evidence standard was appropriate for the defenses of laches and equitable estoppel. *Id.* at 1045–46. In the present case, plaintiffs, arguing for the higher standard of proof, emphasize the importance of the proper exercise of the navigational servitude, and of claimants receiving just compensation for a compensable taking. None of the cited reasons for use of the higher standard of clear and convincing proof, however, were present in *A.C. Aukerman,* and they are not present in this case.

Plaintiffs acknowledge that they have the burden of proof as to the alleged taking of the 1.4 acre parcel.[9] *See Forest Properties, Inc. v. United States,* 177 F.3d 1360, 1367 (Fed.Cir.1999) ("Forest had the burden of proof to establish a regulatory taking, and it failed to carry that burden."), *cert. denied sub nom. RCK Properties, Inc. v. United States,* 528 U.S. 951, 120 S.Ct. 373, 145 L.Ed.2d 291 (1999); *Loesch v. United States,* 227 Ct.Cl. 34, 44, 645 F.2d 905, 914 (1981) ("[T]he burden of proof rests on plaintiffs, and not on the defendant, to establish that a taking has occurred justifying the payment of just compensation.") (citations omitted), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981), *reh'g denied,* 455 U.S. 984, 102 S.Ct. 1496, 71 L.Ed.2d 695 (1982).

The evidentiary standard for plaintiffs as to the alleged taking of the 1.4 acre parcel is a preponderance of the evidence. *Loesch v. United States,* 227 Ct.Cl. at 53, 645 F.2d at 920 (stating that the plaintiffs' burden of proof on their takings claims is a preponderance of the evidence) (citations omitted); *Kingsport Horizontal Property Regime v. United States,* 46 Fed.Cl. 691, 693 (2000) (citing *Sanguinetti v. United States,* 264 U.S. 146, 149–50, 44 S.Ct. 264, 68 L.Ed. 608 (1924)). In its remand opinion, the Federal Circuit placed the burden of proof on defendant for its defense, and did not indicate that a higher evidentiary standard for the defendant was in order. *See Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1385, 1386. Therefore, the normal evidentiary standard of a preponderance of the evidence will be applied to defendant and its navigable servitude defense.[10]

*The Arbitrary or Capricious Standard of Review*

Plaintiffs also argue that judicial review of the Corps' denial of plaintiffs' permit application should inquire as to whether the agency action in question, the Corps' permit denial, was arbitrary, capricious, or an abuse of discretion. Plaintiffs do not explicitly cite to the Administrative Procedure Act's (APA's) standard of review at 5 U.S.C. § 706 (2000), but do cite the case of *Taylor v. District Engineer, U.S. Army Corps of Engineers, Jacksonville, Florida,* 567 F.2d 1332 (5th Cir. 1978), which addressed the APA. In *Taylor,* claimants initially sought injunctive and declaratory relief, and an APA review of the Corps' permit denial, not before the United States Court of Claims, but before the United States District Court for the Southern District of Florida. *Id.* at 1333–34. On appeal, the issue the Fifth Circuit Court of Appeals addressed was whether the proper APA standard of review by the District Court was the substantial evidence standard of review of 5 U.S.C. § 706(2)(E), or the

---

9. "The Plaintiff acknowledges that it bears the burden of proof on the issue of the categorical taking of the 1.4–acre parcel and must establish the elements of such a taking by the preponderance of the evidence."

10. The court notes that even if the standard had been clear and convincing evidence, as will be seen below, defendant also meets this higher standard in demonstrating that a navigational purpose was one of the reasons for the Corps' denial of a permit to develop the 49.3 submerged acres.

arbitrary, capricious or abuse of discretion standard of review of 5 U.S.C. § 706(2)(A). *Id.* at 1335. The Fifth Circuit concluded that the District Court should have applied the section 706(2)(A) standard of review. *Id.* at 1337.

Plaintiffs also cite a military pay case before the Court of Federal Claims, *Zavislak v. United States,* 29 Fed.Cl. 525, 531 (1993), in which the arbitrary or capricious standard was used to review the adverse personnel decision of the Air Force Board for Correction of Military Records; a civilian pay case before the Court of Federal Claims, *Turner v. United States,* 44 Fed.Cl. 588, 593–94, 593 n. 6 (1999), in which the arbitrary or capricious standard of review was used in a prevailing rate dispute; and a Federal Circuit case, *Beardmore v. Department of Agriculture,* 761 F.2d 677, 679 (Fed.Cir.1985), in which the court, as directed by statute, 5 U.S.C. § 7703(c) (1982), reviewed a Merit Systems Protection Board decision under the arbitrary or capricious standard.

■ The United States Court of Federal Claims does not have jurisdiction to conduct an APA review unless directed by statute, and generally does not use an arbitrary or capricious standard of review unless binding case precedent requires it. Examples of the use of the arbitrary or capricious standard of review include the review of Board for Correction of Military Records decisions in military pay cases, prevailing rate civilian pay disputes noted by the plaintiffs, and the court's review of bid protests, prescribed by statute at 28 U.S.C. § 1491(b)(4) (2000) (In a bid protest, the United States Court of Federal Claims "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). In general, however, APA reviews are conducted in federal district court, rather than the Court of Federal Claims, since the APA generally addresses "relief other than money damages," 5 U.S.C. § 702 (1994), and money damages are the cornerstone of this court's Tucker Act jurisdiction. The United States Court of Appeals for the Federal Circuit noted in *Consolidated Edison Company of New York, Inc.* that:

The Supreme Court has explained that a litigant may invoke the APA as a waiver of sovereign immunity, thereby invoking district court jurisdiction, if the litigant can satisfy both 5 U.S.C. § 702 (by requesting "relief other than money damages") and 5 U.S.C. § 704 (1994) (no "adequate remedy" is available elsewhere, such as the Court of Federal Claims). *Bowen v. Massachusetts,* 487 U.S. [879, 892–93, 904–05, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)].

*Consol. Edison Co. of New York v. United States,* 247 F.3d 1378, 1382 (Fed.Cir.), *cert. denied,* 534 U.S. 1054, 122 S.Ct. 644, 151 L.Ed.2d 562 (2001); *see also Vereda, Ltda. v. United States,* 271 F.3d 1367, 1375 n. 8 (Fed. Cir.2001) ("[T]he Court of Federal Claims lacked the general federal question jurisdiction of the district courts, which would have allowed it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706.").

This court has employed an arbitrary or capricious standard of review on proper occasions, as noted above. No statute or binding case authority, however, has directed this court to employ such a standard to review the type of action at issue in this case by the Army Corps of Engineers. Moreover, the United States Court of Appeals for the Federal Circuit, in its multiple remand opinions and orders, has not indicated that an APA review, or that the use of an arbitrary or capricious standard, would be the appropriate standard on remand of plaintiffs' case to this court. Plaintiffs in the present action before this court have brought a takings claim for money damages in excess of $10,000.00 under the Tucker Act. Plaintiffs argue that there is no support in the record for the navigational servitude defense, that the record instead supports only an environmental basis for permit denial. The defendant has the burden of proof to show, by a preponderance of the evidence, that there was "a navigational purpose behind the permit denial." *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1385. Plaintiffs have the burden of proof to show, by a preponderance of the evidence, a compensable regulatory taking of the 1.4 acre parcel. *Palm Beach Isles Assocs. v. United States,*

231 F.3d at 1364–65.[11]

*The Relevant Parcel for Analysis*

In supplemental briefing, defendant, citing recent United States Supreme Court and United States Court of Appeals for the Federal Circuit opinions, attempts to argue, once again, that the relevant parcel in the present case should be the "parcel as a whole," that is, the original 311.7 acre parcel owned by plaintiffs. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 331, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (The landowners' argument "ignores *Penn Central's* admonition that in regulatory takings cases we must focus on 'the parcel as a whole.'") (quoting *Penn Cent. Transp. Co. v. New York,* 438 U.S. at 130–31, 98 S.Ct. 2646); *Walcek v. United States,* 303 F.3d 1349, 1356 (Fed.Cir.) ("The Supreme Court recently reaffirmed that in regulatory takings analysis, the relevant parcel is the parcel as a whole.") (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. at 326–32, 122 S.Ct. 1465), *reh'g and reh'g en banc denied* (2002).

The plaintiffs in the present case had purchased a 311.7 acre parcel in 1956, then 261 acres of this original parcel were sold in 1968, leaving the 49.3 acres of lake bottom and adjoining 1.4 acres along the shoreline at issue. On appeal, the Federal Circuit specifically considered and rejected the trial court's finding that the relevant parcel was the whole 311.7 acre parcel. "As we said in *Loveladies Harbor,* '[o]ur precedent displays a flexible approach, designed to account for factual nuances.' 28 F.3d at 1181." *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1381. On petition for rehearing, the Federal Circuit concluded that defendant had raised no new matters regarding the relevant parcel, indicated that the matter was "fully dealt with in our earlier opinion," and referred the issue to the *en banc* court. *Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357. The Federal Circuit then denied the petition for rehearing *en banc. Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1371.[12] The issue of the relevant

---

**11.** In any event, the arbitrary or capricious standard of review would not assist plaintiffs in this case. The arbitrary or capricious standard is highly deferential to the agency, constituting the narrowest scope of judicial review of an agency's fact finding. "[T]he reviewing court analyzes only whether a rational connection exists between the agency's fact findings and its ultimate action ...." *In re Gartside,* 203 F.3d 1305, 1312 (Fed.Cir.2000). Under such a standard, the court considers "whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

The Federal Circuit, in its Order on the petition for rehearing, stated that the defendant cannot merely invoke the navigational servitude defense:

The first issue is whether the Government's invocation of the navigational servitude as a defense (in reference to regulation of a piece of land to which the servitude properly applies) provides an absolute defense regardless of the facts underlying the alleged purpose for the regulatory imposition, or whether the Government can be challenged to establish that it had a *bona fide navigational purpose.* As noted, the earlier opinion of this court held the latter. *Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357 (emphasis added). In order to invoke a bona fide navigational purpose in the permit denial, the Corps must have acted in good faith. This court, therefore, reviews the Corps'

Statement of Finding supporting the permit denial, other documentary evidence and the testimony of witnesses, effectively asking questions similar to those that would be asked in an arbitrary or capricious review of agency action. This court concludes below that the defendant has established by a preponderance of the evidence a bona fide navigational purpose as one basis for the denial of the requested permit. The record also reflects that defendant considered the relevant factors and did not make a clear error of judgment. Furthermore, there was a rational basis between the facts accumulated and reviewed by the Corps, and its decision to invoke the navigational servitude. Therefore, if the standard of review were the arbitrary or capricious standard of review, the Corps' action similarly would pass muster.

In a supplementary post-hearing brief, plaintiffs modified their earlier position on the arbitrary or capricious standard of review somewhat, stating that: "The law is well established that the United States cannot be arbitrary and capricious in its processing of permit application [sic]. This, however, is not an issue because this is a takings case and the only question is whether or not the Defendant met its burden of proving its affirmative defense which, if it could have, would have necessarily demonstrated that its actions relating to this issue were not arbitrary and capricious."

**12.** Circuit Judge Gajarsa, dissenting, addressed the issue of the relevant parcel as follows:

parcel was fully and repeatedly considered, and was finally determined, by the Federal Circuit. The issue was not remanded to this court, nor was the issue addressed at the subsequent hearing after remand.

*The 49.3 Acre Submerged Parcel*

Defendant also attempts to revisit the argument that plaintiffs have the burden of proof to demonstrate a taking of the 49.3 acre submerged parcel. Defendant states that: "This burden entails establishing each of the elements necessary to prove a regulatory taking under the test announced in *Penn Central,*" citing *Forest Properties, Inc. v. United States,* 177 F.3d at 1367. In *Forest Properties,* the Federal Circuit restated the *Penn Central* factors to be considered for a regulatory taking, as modified by *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), including economic impact, investment-backed expectations, and the common law nuisance doctrine. *See Forest Properties, Inc. v. United States,* 177 F.3d at 1366. Subsequent to the Federal Circuit's opinion in *Forest Properties,* the Federal Circuit first remand opinion in the present case restated the rules for a regulatory taking, as follows:

> The analytical method for examining a regulatory taking claim is set forth in *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994). *Loveladies Harbor* extensively reviewed the law of regulatory takings as it stood prior to the Supreme Court's decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and then explained the impact of *Lucas* on that body of law. As a result of this analysis, *Loveladies Harbor* described the law of regulatory takings in the following manner:

> > a) A property owner who can establish that a regulatory taking of property has occurred is entitled to a monetary recovery for the value of the interest taken, measured by what is just compensation.

> > b) With regard to the interest alleged to be taken, there has been a regulatory taking if

> > (1) there was a denial of economically viable use of the property as a result of the regulatory imposition;

> > (2) the property owner had distinct investment-backed expectations; and

> > (3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.

> 28 F.3d at 1179.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1379.

The Federal Circuit's first remand opinion in *Palm Beach Isles* continued with a description of a categorical taking:

> Subsequently, again citing *Lucas,* this court explained in *Florida Rock Indus. v. United States,* 18 F.3d 1560 (Fed.Cir.1994), that "[i]f a regulation categorically prohibits *all* economically viable use of the land—destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation. There is, without more, a compensable taking." *Id.* at 1564–65. *Florida Rock* went on to point out that even when the taking is considered "categorical," *Lucas* preserved for the Government a nuisance

---

Essentially, the panel concludes that the Rivers and Harbors Act did not apply to the upland property because the development of the 261 acres of upland property "was physically and temporally remote from, and legally unconnected to, the 50.7 acres of wetlands and submerged [property]." *[Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1381 (alteration in original).] This approach contradicts the clear mandate of the Supreme Court that a unit of property cannot be subdivided for the purpose of takings analysis merely because the regulations apply to one portion of the property. *See Penn Central,* 438 U.S. at 130–31, 98 S.Ct. at 2662. *Penn Central* and its progeny

maintain that we should look to the "parcel as a whole" and view the bundle of property rights in its entirety. *See id.* The Supreme Court has recently reaffirmed this proposition. *See Dolan v. City of Tigard,* 512 U.S. 374, 400–01, 114 S.Ct. 2309, 2324–25, 129 L.Ed.2d 304 (1994) ("where an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety"); *Keystone Bituminous Coal Assoc. v. DeBenedictis,* 480 U.S. 470, 497–98, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) (same). *Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1371 (Gajarsa, J., dissenting).

defense to such a taking claim. *See id.* at 1565 n. 10. Thus, when the analysis of prong (1) reveals that the regulatory imposition has deprived the owner of *all* economically viable use of the property (a "categorical taking"), then the only remaining issue is the Government's defense under prong (3).

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1379 (emphasis in original; footnote omitted).[13] In response to the petition to the Federal Circuit for rehearing in *Palm Beach Isles,* the Federal Circuit reconsidered whether, if a taking is categorical, "that determination removes from the analytical equation the question of investment-backed expectations." *Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357. On rehearing, the Federal Circuit reaffirmed its earlier determination. When a regulatory taking is categorical, the property owner will recover without any consideration of investment-backed expectations, as in a physical taking. *Id.* at 1364; *cf. Palm Beach Isles Assocs. v. United States,* 231 F.3d 1365, 1367–70, 1373 (Fed.Cir.2000) (Gajarsa, J., dissenting, in the denial of the petition for rehearing *en banc*). Any such recovery, however, remains subject to the third prong of the regulatory takings test—government defenses subsumed within the nuisance doctrine, such as the navigational servitude. *Id.*

The Federal Circuit, in its first remand opinion, concluded that there was a categorical taking of the submerged land in the present case. *See Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1381. In a categorical taking, the only possible remaining issue is a government defense under prong (3) of the *Penn Central* test, as modified by *Lucas,* implicating the common law nuisance doctrine. *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1379. This court finds below that the Corps' permit denial had a navigational purpose, which constitutes a prong (3) defense to a compensable taking of the submerged parcel. Therefore, the permit denial by the Corps did not constitute a compensable taking of the submerged land.

*The Permitting Process*

The Corps' permit approval process considers proposed project impact in a number of different areas, including evaluating project impact on the navigational servitude. Since 1968, permit applications have been subject to the Corps' broad "public interest review" regulations. According the pertinent regulation:

> All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a) (1989); *see also United States v. Alaska,* 503 U.S. 569, 580–81, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) (describing the broad agency review in the permitting process). The Corps may deny a permit for multiple reasons. The remand issue in the present case is whether the navigational servitude was one of those reasons. *See Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1385 ("If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced.") (quoting *United States v. Twin City Power Co.,* 350 U.S. 222, 224, 76 S.Ct. 259, 100 L.Ed. 240, *reh'g denied,* 350 U.S. 1009, 76 S.Ct. 648, 100 L.Ed. 871 (1956)).

---

13. On rehearing, the Federal Circuit in *Palm Beach Isles* provided a further description of a categorical taking:

> A "categorical" taking is, by accepted convention, one in which *all* economically viable use, i.e., all economic value, has been taken by the regulatory imposition. Such a taking is distinct from a taking that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use.

*Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357 (emphasis in original).

Defendant notes that, in order to construct the proposed 125 lot single family residential development, plaintiffs' May 31, 1989 permit application estimated that 740,900 cubic yards of fill material would be needed to fill the nearly fifty acres of submerged land. Defendant argues that the proposed development project would fill and thereby eliminate approximately fifty acres of navigable waters, resulting in a significant impact on the navigable capacity of Lake Worth.

Mr. Adams, who, at the time of the plaintiffs' permit application was Chief of the Regulatory Division, Jacksonville District, testified that: "In my view the elimination of 48.4 acres of navigable waters absolutely impacts the capacity of navigable waters." According to Mr. Adams, the elimination of nearly fifty acres of open water in Lake Worth "affects the course, condition and capacity of that water body." [14] Mr. Adams noted that the Corps' May 16, 1990 Statement of Finding in support of the permit denial reflected that impact, with its conclusion that the proposed project would involve the "elimination of 48.4 acres of navigable waters . . . ." See United States v. Joseph G. Moretti, Inc., 478 F.2d 418, 421, 429 n. 37 (5th Cir.1973) (In a case involving the dredging and filling of 400,000 cubic yards of earth in the Florida Keys, the court stated that "any filling of navigable waters creates an obstruction to navigation.").

The complete statement in the Corps' Statement of Finding referred to by Mr. Adams is as follows:

(11) Navigation: Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of 48.4 acres of navigable waters, the project should not have a significant adverse impact on navigation, in general.

On cross-examination, Mr. Gauthier, an engineer who processed the permit application for plaintiffs, acknowledged the elimination of submerged land:

Q. Now I'd like to explore for moment the question of navigable capacity, moving to that area. You do admit, do you not, that filling this property, whether it be 40 acres or 50 acres, would have taken out of the navigable waters 40, 50 acres, whatever it is; isn't that correct?

A. It would have taken out, right, the navigation of whatever those submerged lands were that the subject property encompasses.

Q. I'm sorry, I didn't hear the last part.

A. It would have taken out of navigation whatever the acreage of the submerged lands in that project encompasses.

In addition to paragraph "(11) Navigation," of the Corps' Statement of Finding, quoted above, a second paragraph stated:

(13) Recreation: The proposed project would eliminate an open water area of 48.4 acres currently utilized by recreational (as well as commercial) fishermen and boating enthusiasts, not to mention the scores of residents, educators, students, bird-watchers, and others who enjoy the fish, wildlife, and flora resources of the area.

As to this second statement, Mr. Adams was asked on cross-examination the following questions:

Q. And it's your testimony that that states a—that you interpret to be a finding of fact that holds that this project, if it had gone forward, would have been an adverse impact to the navigation capacity of Lake Worth?

A. It says that the project, and in my opinion, the words here say that it will have an impact or an affect [sic] on both commercial and recreational, fishermen and boaters utilizing the area. So it will have an affect on folks, these parties being able to navigate and use that particular portion of the water body.

Q. Okay. So recreational boating, you're identifying the ability to traverse this area for recreational boating, you're equating that to a loss of navigable capacity in Lake Worth?

14. Section 10 of the Rivers and Harbors Act provides that "it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity" of a waterbody, unless the work has received prior approval. 33 U.S.C. § 403.

A. Yes, I think it would.

The record contains several inputs on the proposed project received by the Corps which provided support for Mr. Adams' testimony. For example, the Florida Department of Environmental Regulation, in a May 13, 1990 letter to Mr. Adams, attached its April 13, 1990 denial of plaintiffs' application for a permit, which stated:

> The Department hereby denies the permit for the following reasons:

> The proposed project is expected to result in the elimination of 50.7 ac. of healthy and productive estuarine wetland and submerged habitat in Lake Worth.

> \*   \*   \*   \*   \*   \*

> This project will also result in the following matters which are contrary to the public interest pursuant to Section 403.918(2), Florida Statutes:

> a. adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

> b. adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

> c. adversely affect the fishing or recreational values or marine productivity in the vicinity of the project .... [15]

In addition to the input from the Florida Department of Environmental Regulation, the record contains other inputs supporting Mr. Adams' testimony. The South Atlantic Fishery Management Council, in a January 23, 1990 letter to Colonel Malson, the Corps District Engineer, expressed concern about the project's destruction of recreational and commercial fishing opportunities. The United States Department of the Interior Fish and Wildlife Service, in a January 4, 1990 letter to Colonel Malson, also recommended denial of the permit application due to the

impact on commercial and recreational fishing and wildlife. The National Marine Fisheries Service, in a December 14, 1989 letter to Colonel Malson, expressed concern about the project's impact on marine fisheries. Similarly, the Palm Beach County Board of County Commissioners, in a January 10, 1989 meeting, stated that the project was contrary to the public interest due to its impact on commercial and recreational fishing. A number of property owners protested the project based on its impact on fishing, boating and the study of marine biology.

Donald Borda, the Corps' project manager who processed the plaintiffs' permit application and recommended its denial, in a declaration dated December 21, 1994, attempted to clarify the Corps' statement on navigability which accompanied the May 16, 1990 permit denial:

> On pages 12 and 13 [of the Statement of Finding], Item (11), Navigation, I state, "Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of 49.4 acres of navigable waters, the project should not have a significant adverse impact on navigation, in general." It is important to clarify that I was referring, there, solely to navigation in the broad sense of the commercial or recreational vessels that utilize the adjacent federal navigation channel (Intracoastal Waterway) and that travel in deeper waters. While the proposed fill might not have a significant adverse effect upon the ability of such vessels to move in the federal channel (although it could cause some shoaling of the channel and/or changes in quantity, quality, and direction of flow of the waters), the proposed fill would certainly have an adverse effect on shallow draft vessels that utilize the shallower ar-

---

15. The Florida permit denial adds:

In denying the permit, the Department notes that the applicants' deed from the Trustees of the Internal Improvement Trust Fund may confer an independent right to fill the property. The Department offers no opinion concerning the validity or extent of any such right, but waives the water quality certification required by Public Law 92–500 as a prerequisite for federal dredge and fill permits.

As noted earlier, plaintiffs sued the State of Florida, and in a subsequent settlement, the State acknowledged that, pursuant to the terms of the deed from the Trustees of the Internal Improvement Fund, plaintiffs had the legal right to dredge and fill the 49.3 submerged acres, at least as far as the State of Florida was concerned. *See Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1378.

eas by eliminating over 49 acres of these shallows and by altering the course, location, condition, and capacity of [the] entire waterbody.

The aforementioned statement at pages 12 and 13, Item (11), Navigation, should not be interpreted to mean that the proposed filling would not have a significant adverse impact on "navigable waters of the United States" under § 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, as defined in 33 C.F.R. Part 329. The fill would, without doubt, have a significant adverse affect [sic] upon the entire waterbody by altering or modifying the course, location, condition, or capacity of the lake and the navigation channel, in violation [of] RHA § 10. This is one of the principal reasons the permit was denied.

During direct examination, Mr. Borda was asked what he meant by the statement in the Corps' Statement of Finding, that "[t]he project should not have a significant adverse impact on navigation, in general." Mr. Borda responded, "I meant that it [the proposed project] would not have an adverse impact upon vessels, deep draft vessels, actually using the Federal channel [the Atlantic Intercoastal Waterway]." Mr. Borda added: "There was information that was received through the public notice comments about the area being used by recreational boaters, by fishermen, by local universities for marine studies, and this paragraph relates to that by showing that it would eliminate this open water area of 48.4 acres that were currently used by those interests." On cross-examination, Mr. Borda stated that, "what I was referring to was that it was very obvious that a fill, which I considered to be very massive and significant, of 48.4 acres did in fact have an adverse effect on the navigable capacity of navigable waters of the United States, but it did not have a significant adverse impact on the deep draft vessels traveling within the intercoastal waterway channel."

The testimony of Mr. Adams and Mr. Borda was generally consistent with that of the plaintiffs' witnesses on the impact of plaintiffs' proposed project on navigation. For example, Mr. Kyzer, who qualified as an expert on the impact of projects on naviga-tion, testified for the plaintiffs that the proposed project would not have had an adverse impact on navigation—defining navigable capacity as the ability of an intercoastal waterway channel to serve commercial navigation. Mr. Adams and Mr. Borda similarly agreed that the project would not have a significant, adverse impact on deep draft vessels using the Atlantic Intracoastal Waterway, since only shallow draft craft could use the water over the 49.3 submerged acreage. Dr. Beam, who qualified as an expert in navigation, testified for plaintiffs that he did not believe the project would have an adverse effect on commercial navigation, given the shallow depth of the submerged land that would be filled. Mr. Adams and Mr. Borda acknowledged the shallow depth of the submerged land that would be filled.

Mr. Higgins, who qualified as an expert in water resources, also testified for plaintiffs that the water over the submerged land was shallow, about three to four feet in depth, and that he did not believe the project would have any adverse impact on navigation. Mr. Higgins, however, was not thinking of navigation only in terms of deep draft vessels using the Atlantic Intracoastal Waterway. Mr. Higgins defined navigation to include commercial and recreational purposes, such as fishing and recreational boating. On cross-examination, Mr. Higgins testified as follows:

Q. So if it was possible that recreational boating could have taken place across this 40 or 50 acres of submerged land, then that water in your definition would be navigable?

A. Yes.

Q. So if in fact there was some evidence in the record when the Corps was processing the permit, I just want you to assume this, assume there is some evidence in the record when the Corps is processing the permit that this area is used by fishermen. If that's the set of facts in front of you, would you agree that the Corps would then have a navigational purpose in denying the permit under Section 10?

A. No.

Q. Why not?

A. Because that's not necessarily the only place where fishing could occur within Lake Worth. There's other suitable locations.

Q. So your definition then of impact upon commercial fishing under Section 10 is, that if a project is done at one location but you can still fish next door, you're not impacting navigation?

A. As long as there's not a demonstrated cumulative approval of those fill projects, correct.

The Federal Circuit, in its first remand opinion, determined that the 49.3 acres of submerged land is subject to the federal navigational servitude. *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1382–84. The record reflects that 49.3 acres of land submerged under shallow water would be removed from Lake Worth by the proposed project. The body of water eliminated, however, would not support deep draft vessels. Deep draft vessels would operate in the Atlantic Intracoastal Waterway, a deeper part of Lake Worth west of the 49.3 submerged acres at issue. The 49.3 submerged acres which would be eliminated by the plaintiffs' development project could support only shallow draft vessels—commercial and recreational boating and fishing craft with a shallow draft.

The two critical paragraphs in the Corps' Statement of Finding, which provided the rationale for permit denial, stated:

(11) Navigation: Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of 48.4 acres of navigable waters, the project should not have a significant adverse impact on navigation, in general.

\*     \*     \*     \*     \*     \*

(13) Recreation: The proposed project would eliminate an open water area of 48.4 acres currently utilized by recreational (as well as commercial) fishermen and boating enthusiasts, not to mention the scores of residents, educators, students, bird-watchers, and others who enjoy the fish, wildlife, and flora resources of the area.

Paragraph (11), immediately above, indicated that approximately 49 acres of navigable water would be eliminated by the proposed project, that only shallow draft vessels could operate in the shallow water over the approximately 49 acres of submerged land at issue, and that deep draft vessels operating in the deeper Atlantic Intracoastal Waterway to the west of the 49 acres would not be significantly impacted by the proposed project. Paragraph (13) added that recreational and commercial fishermen and boaters would be impacted by elimination of the approximately 49 acres of shallow water. The issue, then, is whether the Corps' citation of the removal of 49 acres of shallow water, navigable only by the shallow draft craft of commercial and recreational fishermen and boaters, will support a bona fide navigable servitude defense.

*Navigable Servitude*

The United States Court of Appeals for the Federal Circuit in its first remand opinion in *Palm Beach Isles* stated that the navigational servitude stems from the Commerce Clause of the United States Constitution, providing the federal government with the "power to regulate and control the waters of the United States in the interest of commerce." *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1382 (citing *United States v. Rands*, 389 U.S. 121, 122–23, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967) (the latter stating that riparian owners have always been subject to the navigational servitude)).

The first *Palm Beach Isles* remand opinion continued:

Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed interests were not part of his title to begin with.

*Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1382 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). In the same *Palm Beach Isles* opinion, the Federal Circuit also noted that the United States Supreme Court, in *Lucas*, cited navi-

gational servitude as an example of a defense by which the federal government may resist a compensable taking:

> [W]e assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title.... *Scranton v. Wheeler*, 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126 (1900) (interests of "riparian owner in the submerged lands ... bordering on a public navigable water" held subject to Government's navigational servitude).

*Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1383 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1028–29, 112 S.Ct. 2886) (omissions in original); *see also United States v. 30.54 Acres of Land*, 90 F.3d 790, 796 (3rd Cir.1996) ("The navigational servitude was always a limitation inherent in the landowners' title, and therefore exercise of the servitude was not a taking.") (quoted in *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1384); *Coastal Petroleum Co. v. United States*, 207 Ct.Cl. 701, 708, 524 F.2d 1206, 1209, *as amended* (1976) ("[N]avigation[al] servitude is an extremely old concept—owners of property or property rights within navigable waters take those rights fully cognizant of their limited nature.") (citations omitted), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 567, 66 L.Ed.2d 469 (1980), 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982).

■ Invocation of the navigational servitude cannot be a pretext to avoid an otherwise compensable taking. *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1385 (quoting *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 737, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) (in rejecting the government's claim of immunity under the navigational servitude, the United States Supreme Court in *Gerlach* noted: "Claimants ... observe that this court has never permitted the Government to pervert its navigational servitude into a right to destroy riparian interests without reimbursement where no navigation purpose existed.") (omission in original)). However, the presence of multiple govern-

mental purposes, so long as navigation is one of those purposes, will not defeat a navigational servitude defense. *See United States v. Twin City Power Co.*, 350 U.S. at 224, 76 S.Ct. 259 ("If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced.") (quoted in *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1385).

■ Addressing the navigational servitude, Congress, in broad language, prohibits any unauthorized obstruction to the navigable capacity, requires a permit from proper authority before the construction of any structure in a navigable waterbody, and requires a permit from proper authority before obstructing, excavating, filling, altering or modifying the navigable capacity of any bodies of water within the United States.

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

Rivers and Harbors Act of 1899, § 10, 30 Stat. 1151 (Mar. 3, 1899), codified at 33 U.S.C. § 403 (2000).[16] The above statutory

---

**16.** Volume 33 of the C.F.R. is titled "Navigation and Navigable Waters." Navigable waters of the United States are defined in the regulation as:

those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be suscepti-

language is unchanged since its enactment in 1899.

Plaintiffs argue that this court's focus should be exclusively on the Intercoastal Waterway. Plaintiffs support this contention by citing to the following underlined portion of the Rivers and Harbors Act of 1899, section 10:

> [I]t shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of *the channel of any navigable water of the United States,* unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

Rivers and Harbors Act of 1899, § 10, codified at 33 U.S.C. § 403 (emphasis added by plaintiffs). Although the term "channel" is included in the act, as noted above, review of prior judicial interpretation of the act is necessary to evaluate plaintiffs' argument that section 10 is concerned only with the channel of the Atlantic Intercoastal Waterway.

The reach of section 10 has been declared by the United States Supreme Court to be expansive:

> The language of this provision [section 10] is quite broad. It flatly prohibits the "creation of *any* obstruction" to navigable capacity that Congress itself has not authorized, and it bans construction of any structure in any water of the United States "except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army."

*United States v. Alaska,* 503 U.S. at 576, 112 S.Ct. 1606 (citing 33 U.S.C. § 403) (emphasis in original). An early United States Supreme Court opinion had a similarly expansive interpretation of a predecessor statute to the Rivers and Harbors Act of 1899—an 1890 statute which similarly prohibited unauthorized obstructions to the navigable capacity:

It is urged that the true construction of this act limits its applicability to obstructions in the navigable portion of a navigable stream, and that as it appears that, although the Rio Grande may be navigable for a certain distance above its mouth, it is not navigable in the territory of New Mexico, this statute has no applicability. The language is general, and must be given full scope. It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done or however done, within the limits of the jurisdiction of the United States, which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition.... [I]t would be to improperly ignore the scope of this language to limit it to the acts done within the very limits of navigation of a navigable stream.

*United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 708, 19 S.Ct. 770, 43 L.Ed. 1136 (1899) (addressing the Act of September 19, 1890, ch. 907, § 10, 26 Stat. 454, which stated, in language similar to the Rivers and Harbors Act of 1899, § 10: "That the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect to which the United States has jurisdiction, is hereby prohibited.").

The United States Court of Appeals for the Federal Circuit, in the first *Palm Beach Isles* remand opinion, addressed the fact that the 49.3 submerged acres are under shallow water, and concluded that the shallow water is subject to the navigable servitude:

> PBIA [Palm Beach Isles Associates] argues that the water depth over the 49.3 acres (1–3 feet) is insufficient to support commercial navigation, and thus does not implicate the navigational servitude. Under this view, the underlying land would not be subject to it. According to PBIA, the fact that Lake Worth as a whole is navigable is irrelevant; only the navigability of the 49.3 acre portion matters. The

ble for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extin-

guished by later actions or events which impede or destroy navigable capacity.

33 C.F.R. § 329.4 (1989).

Government counters that navigation need not be "commercial" to implicate the navigational servitude, and the mere ability of the water to support even small boats is sufficient to implicate it; since Lake Worth as a whole is navigable, the entire body up to the mean high water mark is subject to the navigational servitude, regardless of particular depths.

A review of the relevant authorities and precedent indicates that the Government's understanding of the concept of federal navigability is closer to correct than is PBIA's, and that the property is subject to the navigational servitude. In *[United States v.] Rands,* [389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967),] the Supreme Court noted that the navigational servitude "extends to the entire [navigable] stream and the stream bed below ordinary high-water mark." 389 U.S. at 123, 88 S.Ct. 265. This court later cited *Rands* and other Supreme Court precedent and said that "[l]and or property within the bed [of a navigable waterbody] are always subject to (or burdened with) the potential exercise of the navigational servitude," and that "the Supreme Court has left no doubt that the high-water mark bounds the bed of the [navigable body]." *Owen v. United States,* 851 F.2d 1404, 1409 (Fed.Cir.1988) (*en banc*). Thus, since the parcel at issue lies below the high water mark, is part of the bed of Lake Worth, and Lake Worth is a navigable water of the United States, the parcel is subject to the navigational servitude. The particular water depth over PBIA's land is not controlling.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1382 (alteration in original; footnotes omitted); *accord Coastal Petroleum Co. v. United States,* 207 Ct.Cl. at 708, 524 F.2d at 1209–10 (" 'The navigation easement is not limited to the thread of the stream where vessels pass, but extends from ordinary high water on one side to ordinary high water on the other.' *Allen Gun Club v. United States,* 180 Ct.Cl. 423, 429, 1967 WL 8872 (1967). Where applicable, the servitude covers the whole of the water found to be navigable, not merely the channel actually used."), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 567, 66 L.Ed.2d 469 (1980), 456 U.S. 915, 102

S.Ct. 1770, 72 L.Ed.2d 174 (1982); *Alameda Gateway, Ltd. v. United States* 45 Fed.Cl. 757, 763 (1999) ("The federal navigational servitude extends to the entirety of a stream and to the stream bed below the ordinary high-water mark. Land or property within the bed of a navigable stream is always subject to the potential exercise of the navigational servitude.") (citation omitted); *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 753 (9th Cir.1978) (Navigable waters "extend to all places covered by the ebb and flow of the tide to the mean highwater (MHW) mark in its unobstructed, natural state."); *United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 600, 610 (3d Cir.1974) (in which the court found that even shallow tidal marshes, bordered by the Intercoastal Waterway, were navigable waters under the Rivers and Harbors Act of 1899, § 10), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); *United States v. Joseph G. Moretti, Inc.,* 478 F.2d at 428–29 n. 37 (stating that navigable water was near but outside the Intercoastal Waterway, and that "any filling of navigable waters creates an obstruction to navigation.").

In determinations of navigability, use and capability for use of a waterbody by even small draft vessels have been dispositive. For example, the United States Supreme Court, in *Appalachian Electric Power Co.,* found a river to be navigable, after considering the use of flat-bottomed boats on the river, "with a draft of two feet and a carrying capacity varying up to 10 or 12 tons ... used commercially to transport lumber, tobacco and other products of the region." *United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 411, 418–19, 61 S.Ct. 291, 85 L.Ed. 243 (1940), *reh'g denied,* 312 U.S. 712, 61 S.Ct. 548, 85 L.Ed. 1143 (1941), 317 U.S. 594, 63 S.Ct. 67, 87 L.Ed. 487 (1942). The Court in *Appalachian Electric Power Co.* cited use on the river of numerous types of shallow draft vessels, including "a government survey boat ... drawing 2½ to 3 feet, loaded with a crew of five and its survey equipment," and "[k]eelboats, eight feet wide, drawing two feet ...." *Id.* at 415–17, 61 S.Ct. 291; *see also The Montello,* 20 Wall. 430, 87 U.S. 430, 441, 22 L.Ed. 391 (1874)

(finding navigable a river upon which traveled boats which "drew when loaded two to two and one-half feet of water"); *Allen Gun Club v. United States,* 180 Ct.Cl. at 428 (boats drawing three feet of water used navigable waterbodies for fishing and hunting purposes and "[l]ogging and fishing) (*see Iowa–Wisconsin Bridge Co. v. United States,* 114 Ct.Cl. 464, 508–09, 84 F.Supp. 852, 866 (1949), *cert. den[ied],* 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386 (1950) are sufficient navigation uses ...."); *United States v. Joseph G. Moretti, Inc.,* 478 F.2d at 428 n. 35 (the court noted that charts indicated a two-foot depth along one edge of a navigable waterbody).

The Supreme Court in *Appalachian Electric Power Co.* added: "Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation." *United States v. Appalachian Elec. Power Co.,* 311 U.S. at 416, 61 S.Ct. 291 (footnote omitted). Citing *United States v. Appalachian Electric Power Co.,* 311 U.S. at 407, 61 S.Ct. 291, the Fifth Circuit Court of Appeals similarly concluded that: "There is no requirement that a body of water sustain actual commerce in order to meet the test of navigability. Rather, the mere capability of commercial use of a body of water suffices ...." *Weiszmann v. Dist. Eng'r, United States Army Corps of Eng'rs,* 526 F.2d 1302, 1305 (5th Cir.1976) (other citation omitted).

Similarly, in Part 329, "Definition of Navigable Waters of the United States," the Corps' regulations stress the capability of waterbodies for use in transportation and commerce, as well as the role of shallow draft vessels, including recreational vessels, in demonstrating the capability of waterbodies to be navigable:

(a) *Nature of commerce: type, means, and extent of use.* The types of commercial use of a waterway are extremely varied and will depend on the character of the region, its products, and the difficulties or dangers of navigation. It is the waterbody's capability of use by the public for purposes of transportation of commerce which is the determinative factor, and not the time, extent or manner of that use. As discussed in § 329.9 [17] of this Part, it is sufficient to establish the potential for commercial use at any past, present, or future time. Thus, sufficient commerce may be shown by historical use of canoes, bateaux, or other frontier craft, as long as that type of boat was common or well-suited to the place and period. Similarly, the particular items of commerce may vary widely, depending again on the region and period. The goods involved might be grain, furs, or other commerce of the time. Logs are a common example; transportation of logs has been a substantial and well-recognized commercial use of many navigable waters of the United States. Note, however, that the mere presence of floating logs will not of itself make the river "navigable"; the logs must have been related to a commercial venture. Similarly, the presence of recreational craft may indicate that a waterbody is capable of bearing some forms of commerce, either presently, in the future, or at a past point in time.

33 C.F.R. § 329.6(a) (1989); *see also Atlanta Sch. of Kayaking, Inc. v. Douglasville–Douglas County Water and Sewer Auth.,* 981

---

17. Section 329.9, titled "Time at which commerce exists or determination is made," states:

(a) *Past use.* A waterbody which was navigable in its natural or improved state, or which was susceptible of reasonable improvement (as discussed in § 329.8(b) of this Part) retains its character as "navigable in law" even though it is not presently used for commerce, or is presently incapable of such use because of changed conditions or the presence of obstructions. Nor does absence of use because of changed economic conditions affect the legal character of the waterbody. Once having attained the character of "navigable in law," the Federal authority remains in existence, and cannot be abandoned by administrative officers or court action. . . .

(b) *Future or potential use.* Navigability may also be found in a waterbody's susceptibility for use in its ordinary condition or by reasonable improvement to transport interstate commerce. This may be either in its natural or improved condition, and may thus be existent although there has been no actual use to date. Non-use in the past therefore does not prevent recognition of the potential for future use.

33 C.F.R. § 329.9 (1989).

F.Supp. 1469, 1473 (N.D.Ga.1997) (citing the above quoted regulation, 33 C.F.R. § 329.6(a), the District Court found that the use of shallow draft vessels, such as kayaks and canoes, demonstrated the substantial likelihood that a river and reservoir would be found to be navigable). Plaintiffs in the present case attempt to draw a distinction between recreational craft and commercial vessels used for business purposes. In fact, however, the Corps' rules, quoted above, recognize the need for "commercial ventures," and also recognize the importance of recreational craft in demonstrating the capability for commercial activity.

Plaintiffs argue that the record contains no evidence that the deepwater channel of the Atlantic Intercoastal Waterway would have been disturbed by the proposed project. When Mr. Borda, the Corps' project manager who processed the plaintiffs' permit application, was asked what he meant by the language in the Statement of Finding accompanying the permit denial—that "the project should not have a significant adverse impact on navigation, in general," he testified: "I meant that it would not have an adverse impact upon vessels, deep draft vessels, actually using the Federal channel [Atlantic Intercoastal Waterway]." Plaintiffs' conclusion is that: "Because there is no evidence in the record that the ICW [Intercoastal Waterway] channel in Lake Worth would have been disturbed by the Plaintiff's project, there is no legal support for the government's invocation of the navigational servitude with respect to the 49.3–acre parcel." This view is consistent with plaintiffs' witnesses who testified that they thought the proposed project would have no impact on navigable capacity. For example, Mr. Kyzer, a professional engineer, defined navigable capacity in terms of an intercoastal waterway channel to serve commercial navigation. Another of plaintiffs' witnesses, Dr. Beam, testified that, in his view, the 49.3 acres was too shallow to support commercial navigation.

Plaintiffs argue that the Rivers and Harbors Act was not designed to prevent all actions taken by a riparian owner—short of interference with navigation in a Federal channel—and cite several cases in an attempt to support their argument. The first case cited by plaintiffs is *People v. Amerada Hess Corporation,* 84 Misc.2d 1036, 375 N.Y.S.2d 1001 (N.Y.Crim.Ct.1975). In that case, the criminal defendant, Amerada Hess, was accused of filling in its waterfront property with broken concrete without a city permit, in violation of Rule 3(b) of the Rules and Regulations of the New York City Department of Ports and Terminals. *Id.,* 375 N.Y.S.2d at 1002–03. The criminal court dismissed the charges against Amerada Hess for the following reasons:

> But while a riparian owner who seeks to improve his property must do so without obstructing the navigability of a waterway or without destroying the property of another riparian owner, he is, nevertheless, entitled to build some form of protection to establish his boundary or to prevent the loss of soil by the process of erosion.

> This court rejects the conclusion that Rule 3(b) requires permission from a governmental body before a person or a corporation reinforces his or its existing boundary line. Further, the court rejects the view that a boundary repair is the equivalent of a fill operation within the meaning of the section. In that regard the proof fails.

*People v. Amerada Hess Corporation,* 375 N.Y.S.2d at 1004–05 (citations and footnote omitted). *Amerada Hess* is distinguishable from the present case. The case did not implicate the federal navigable servitude, but did implicate New York City rules and regulations designed to protect navigable waterways. Criminal defendant Amerada Hess had contended, however, that it did not obstruct a waterway with broken concrete, but placed its concrete fill on the bank of the Westchester Creek, above the high water mark. Under these facts, the New York Criminal Court declined to find Amerada Hess guilty, under the heightened standard of proof in criminal cases, beyond a reasonable doubt, of obstructing a waterway. In the present case, plaintiffs' project would directly impact the waterway.

Plaintiffs also cited *United States v. Republic Steel Corporation,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, *reh'g denied,* 363

U.S. 858, 80 S.Ct. 1605, 4 L.Ed.2d 1739 (1960). In that case, the United States Supreme Court determined that industrial solids deposited in the Calumet River by Republic Steel, which reduced the depth of the channel, violated Section 10 of the Rivers and Harbors Act. *Id.* at 483–85, 489, 80 S.Ct. 884. The court did not agree with Republic Steel that the term "obstruction" in the act is limited to structures, with "any obstruction" to navigable waterbodies prohibited by the Section 10. After reviewing the history of the construction of Section 10, the Court concluded:

> The teaching of those cases is that the term "obstruction" as used in § 10 is broad enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses [of § 10]. In the *Sanitary District [of Chicago v. United States,* 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925)] case it was caused by lowering the water level. Here it is caused by clogging the channel with deposits of inorganic solids. Each affected the navigable "capacity" of the river. The concept of "obstruction" which was broad enough to include the former seems to us plainly adequate to include the latter.

*United States v. Republic Steel Corp.,* 362 U.S. at 489, 80 S.Ct. 884. Although the Supreme Court was addressing obstructions in the river channel in *Republic Steel,* the case is of no assistance to plaintiffs. The Supreme Court construed the reach of Section 10 broadly, and did not address or even intimate that industrial solids may be deposited in shallow draft areas of a navigable waterbody without implication for the navigable servitude.

The plaintiffs also cited *United States v. 412.715 Acres of Land, Contra Costa County, Cal.,* 53 F.Supp. 143 (N.D.Cal.1943). In this case the government condemned land for the construction of a naval fuel supply depot for the United States Navy. *Id.* at 144. The government argued that the portion of the project involving submerged lands was subject to the navigational servitude. *Id.* at 148. The federal District Court stated that: "Unquestionably, it [the government] may deepen channels, widen streams, erect lighthous-

es, build bridges, construct dams, and make similar improvements, without compensating the owners of land subject to the navigation servitude." *Id.* at 148. Nevertheless, the District Court would not permit the government to invoke the navigational servitude in support of the naval fuel supply depot, declining to follow a contrary result in *Bailey v. United States,* 62 Ct.Cl. 77, 94–96, 1926 WL 2717 (1926), *cert. denied,* 273 U.S. 751, 63 Ct.Cl. 685, 47 S.Ct. 455, 71 L.Ed. 873 (1927). *See United States v. 412.715 Acres of Land, Contra Costa County, Cal.,* 53 F.Supp. at 148–49.

In *Bailey,* plaintiffs were lessees of submerged land for purposes of oyster farming. *Bailey v. United States,* 62 Ct.Cl. at 93. The submerged lands were taken by the United States Navy in *Bailey* to establish a naval operating base. Plaintiffs' oyster beds were destroyed, and plaintiffs sought compensation from the government as a result. *Id.* at 94. The United States Court of Claims determined that the taking by the Navy was for the purpose of navigation, and denied compensation, due to the navigable servitude. *Id.* at 94–96. The federal District Court in *412.715 Acres of Land,* in contrast to the *Bailey* case, decided that the taking in the case before it was not for navigational purposes, but to "maintain a navy," for which compensation was due plaintiffs. *United States v. 412.715 Acres of Land, Contra Costa County, Cal.,* 53 F.Supp. at 149. To the extent that the two cases are in conflict, United States Court of Claims cases constitute binding precedent on this court. More importantly, the facts in both *Bailey* and in *412.715 Acres of Land* are distinguishable from those in the present case. In the present case, land is not being taken by the United States Navy to establish a military base for military purposes, and this court is not being called upon to determine if the taking is for an exclusively military purpose, or for a military purpose which also supports navigation. In plaintiffs' case, as discussed earlier, the Corps' permit denial was, in part, to prevent the impact from plaintiffs' proposed development project on a navigable waterbody, in furtherance of the navigational servitude.

This court rejects plaintiffs' contention that the navigational servitude may be invoked only if the plaintiffs' proposed project disturbs the Atlantic Intracoastal Waterway. Binding case authority has already determined that: "The navigation easement is not limited to the thread of the stream where vessels pass, but extends from ordinary high water on one side to ordinary high water on the other." *Coastal Petroleum Co. v. United States*, 207 Ct.Cl. at 708, 524 F.2d at 1209–10 (quoting *Allen Gun Club v. United States*, 180 Ct.Cl. at 429); *see also Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1382 (citing *United States v. Rands*, 389 U.S. at 123, 88 S.Ct. 265 and *Owen v. United States*, 851 F.2d at 1409). Plaintiffs' argument, which would justify permit denial only if deep draft vessels in the federal channel would be affected by the proposed housing project, would effectively repeal binding case authority which extends the potential exercise of the navigational servitude to the entirety of the waterbody and its submerged bed below the ordinary high water mark, including shallow areas.

Small draft vessels operating in shallow water can and have rendered a waterbody navigable. *See United States v. Appalachian Elec. Power Co.*, 311 U.S. at 411, 418–19, 61 S.Ct. 291; *Allen Gun Club v. United States*, 180 Ct.Cl. at 428; *United States v. Joseph G. Moretti, Inc.*, 478 F.2d at 428 n. 35. If small craft operating in shallow water are competent to support navigability, then the preservation of shallow water in navigable waterbodies is a legitimate exercise of the navigational servitude. Moreover, in defining navigable waters, a waterbody's capability of bearing some forms of commerce is a determinative factor. *See United States v. Appalachian Elec. Power Co.*, 311 U.S. at 407, 416, 61 S.Ct. 291; *Weiszmann v. Dist. Eng'r, United States Army Corps of Eng'rs*, 526 F.2d at 1305; 33 C.F.R. §§ 329.6(a), 329.9(b). If capability of a waterbody for use in transportation and commerce is competent to support navigability, then the preservation of capacity for shallow draft vessels is a legitimate exercise of the navigational servitude.

In conclusion, the Federal Circuit has considered, and rejected, the concept that the shallow water depth of the 49.3 acres in question is insufficient to support commercial navigation and insufficient to implicate the navigational servitude. *See Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1382 ("Thus, since the parcel at issue lies below the high water mark, is part of the bed of Lake Worth, and Lake Worth is a navigable water of the United States, the parcel is subject to the navigational servitude."). Section 10 of the Rivers and Harbors Act of 1899, in broad language, "flatly prohibits the 'creation of *any* obstruction' to navigable capacity" that is not authorized by Congress or approved by the Corps. *United States v. Alaska*, 503 U.S. at 576, 112 S.Ct. 1606 (emphasis in original). One of the remand issues in the present case is whether the navigational servitude, which was potentially a basis for permit denial, was in fact a bona fide reason for the Corps' permit denial. The Corps' Statement of Finding which accompanied the permit denial, at paragraph "(11) Navigation," recognized the shallow water depth of the submerged acreage ("Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels."); concluded that navigable water would be eliminated by the proposed project ("... the elimination of 48.4 acres of navigable waters ...."); and indicated that, due to the shallow water, deep draft vessels would not be affected by the plaintiffs' project ("[T]he project should not have a significant adverse impact on navigation, in general."). The Statement of Finding, at paragraph "(13) Recreation," concluded that navigable water used by commercial and recreation fishermen and boaters would be eliminated ("The proposed project would eliminate an open water area of 48.4 acres currently utilized by recreational (as well as commercial) fishermen and boating enthusiasts ...."). The Corps' concern for shallow draft recreational fishermen and boaters is a legitimate interest, because such recreational activity indicates the potential capacity for shallow draft vessels engaging in commercial activity. *See* 33 C.F.R. § 329.6(a) ("[T]he presence of recreational craft may indicate that a waterbody is capable of bearing some

forms of commerce, either presently, in the future, or at a past point in time."). The Corps also indicated concern for the activities of commercial fishermen and boaters, and for the elimination of nearly fifty acres of navigable water, which directly implicates the navigational servitude.

The court concludes that the navigable servitude was invoked by the Corps as one of the reasons for the permit denial. Furthermore, the implication of the navigable servitude was legitimate, in that navigable capacity is concerned with more than deep draft vessels operating in a federal channel. Shallow water portions of a waterbody have constituted support for navigability determinations, and the preservation of the shallow water portions of a navigable waterbody represents a legitimate concern when considering, and denying permits. The plaintiffs' proposed project would have altered the course and capacity of a navigable water body of the United States. The Corps possessed a bona fide navigational purpose in the permit denial, which constitutes a complete defense to a compensable regulatory taking of the 49.3 submerged acres.

*1.4  Acre Shoreline Parcel*

■ The Federal Circuit Order on the defendant's petition for rehearing noted that the 1.4 acres are not submerged property potentially subject to the federal navigational servitude defense, and, therefore, should be analyzed separately from the 49.3 acre submerged parcel:

On further review, then, we conclude that the proper disposition of the issue regarding the 1.4 acres is to remand the question of a taking to the trial court. If the trial court determines that the permit denial constituted a categorical taking of the 1.4 acre tract, then, absent any other defenses the Government may have, PBIA is entitled to compensation as if it were a physical taking for government purposes. If the trial court determines that, on the facts, the permit denial constituted less than a total wipeout of economically viable use, the court must then determine if there is a partial taking, applying the *Penn Central* [18] criteria (as modified by *Lucas* [19]— see this court's explanation in *Loveladies Harbor*, [20] see also *Florida Rock* ).[21]

*Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1365.[22]

Plaintiffs acknowledge that they have the burden of proof to demonstrate a compensable taking of the 1.4 acre parcel. Nathanial J. Orr, a real estate appraiser testifying for the plaintiffs, stated that he visited the 1.4 acre parcel and concluded that the narrow strip of land could not be developed. Mr. Orr testified that: "The only possible use in my opinion would be to combine it with the [submerged] land immediately west of it which was a total of about 50 acres of land, to develop the entire tract." The government agrees with Mr. Orr's conclusion, stipulating, along with plaintiffs, that the 1.4 acre parcel "has no economically viable uses when considered separately from the 49.3 acres of

**18.** *Penn Central Transportation Company v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

**19.** *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

**20.** *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.), *reh'g and rehearing en banc denied* (1994).

**21.** *Florida Rock Industries, Inc. v. United States,* 18 F.3d 1560 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

**22.** In its earlier remand opinion, the Federal Circuit had stated:

The trial court concluded that, without development of the 49.3 acres of submerged land, the 1.4 acres of adjoining wetlands would be of little, if any, value. Upon full examination of the record, we see no error in that conclusion. If there is a taking by the Government of the 49.3 acres, then there also must be a taking of the adjoining wetlands as well, and PBIA will be entitled to compensation therefor; if there is no taking because of the navigational servitude, the developmental value of the adjacent wetlands strip standing alone would be at most nominal—the attorney for PBIA admitted as much in oral argument—and in any event PBIA has failed to establish that no other uses are available to it.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1386.

submerged land after the denial of the permit application by the Corps of Engineers."

Plaintiffs reason that, if there was value in the 1.4 acre parcel *before* permit denial, and no value in the parcel *after* permit denial, the property value must have been eliminated as a result of the permit denial—a prong one regulatory takings analysis resulting in a categorical taking.[23] Since the parties agree that there was no value in the 1.4 acres after permit denial, plaintiffs' argument focuses on whether there was value in the 1.4 acres before permit denial. In this regard, plaintiffs argue that: "The Court of Appeals has held in this case that the 1.4–acre parcel had value before the Corps' permit denial and that this is not an issue on remand," citing *Palm Beach Isles Associates v. United States*, 231 F.3d at 1364. This court's reading of the Federal Circuit's Order on the petition for rehearing, however, differs from the plaintiffs' reading. The Federal Circuit stated:

> As we noted at the beginning of this Order, we have no doubt that the relevant parcel for analysis is not the entire 311–acre parcel first purchased in 1956, but a subset of that parcel. The subset we defined in the original opinion—the 50.7 acres—consists of 49.3 acres of submerged lands, and 1.4 acres of adjacent uplands, described as wetlands. We concluded in the original opinion that, based on the trial court's findings, these two tracts should be treated together.
>
> However, the wetlands are essentially upland property, and are not subject to the Government's defenses under the navigational servitude. Accordingly, the 1.4 acres should be analyzed separately. In her summary judgment order, the trial court concluded that there had not been a taking of the 1.4 acres on three grounds.

First, the court determined that the relevant parcel was the entire 311 acres, and that therefore the 1.4 acres was subsumed within it. As we have held, that finding is erroneous. Second, the trial court held that PBIA [plaintiffs] knew when it bought the property that it would need permits to develop the land, and thus the existing statutory regime precluded any reasonable investment-backed expectation of being able to develop the property. And third, the court found that while the 1.4 acre section by itself is insufficient for building homes, PBIA had not established that all other uses were foreclosed.

On the second point, *the record suggests that PBIA may well have had investment-backed expectations for the 1.4 acres*, since shortly after purchasing the property in 1957 they were able to obtain dredge and fill permits from the Corps of Engineers. The existence of a regulatory regime does not per se preclude all investment-backed expectations for development. The difficulty with the third point is that it involves a disputed question of fact—what uses are left for the tract after the permit denial—and the case was decided on summary judgment.

*Palm Beach Isles Associates v. United States*, 231 F.3d at 1364–65 (emphasis added). If all economically viable use was destroyed by the permit denial (a categorical taking), then prong two (investment-backed expectations) falls away, and the only remaining issue is whether or not there is a prong three defense such as the navigable servitude. Alternatively, if there was "less than a total wipeout of economically viable use" from the permit denial (a partial taking), then both prong two and prong three are potential issues. *Id.* at 1365.

*Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1379 (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d at 1179). The Federal Circuit added: "[W]hen the analysis of prong (1) reveals that the regulatory imposition has deprived the owner of *all* economically viable use of the property (a 'categorical taking'), then the only remaining issue is the Government's defense under prong (3)." *Palm Beach Isles Assocs. v. United States*, 208 F.3d at 1379 (emphasis in original).

**23.** The Federal Circuit's statement of the test for a compensable regulatory taking is as follows:
(1) there was a denial of economically viable use of the property as a result of the regulatory imposition;
(2) the property owner had distinct investment-backed expectations; and
(3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.

To demonstrate value in the 1.4 acres, before permit denial, plaintiffs argue that the Federal Circuit has already made that determination, relying on the statement quoted above: "the record suggests that PBIA may well have had investment-backed expectations for the 1.4 acres, since shortly after purchasing the property in 1957 they were able to obtain dredge and fill permits from the Corps of Engineers." *Palm Beach Isles Associates v. United States,* 231 F.3d at 1364. The Federal Circuit, in using these less than conclusive terms, including the term "may," did not render a final and conclusive determination that the 1.4 acres had economically viable uses before permit denial.

Plaintiffs have not demonstrated economical uses of the 1.4 acre parcel either before or after permit denial, apart from joint development with the 49.3 submerged acres. The 1957 permit, and the permit sought in 1989, were not permits to dredge and fill exclusively the 1.4 acre parcel. Both permits were to dredge and fill the 1.4 acres with the adjoining 49.3 acres, thereby providing no indication that the 1.4 acres had some economical use standing alone. Plaintiffs' own witness, real estate appraiser Orr, in uncontested testimony, testified that: "The only possible use in my opinion would be to combine it [the 1.4 acres] with the [submerged] land immediately west of it which was a total of about 50 acres of land, to develop the entire tract." Plaintiffs may have intended that Mr. Orr's statement only address value of the 1.4 acre parcel after permit denial, but plaintiffs have not explained why the statement does not also apply to the value of the 1.4 acre parcel before permit denial. Plaintiffs introduced no evidence that conditions after permit denial were any different from conditions before permit denial. Plaintiffs have not contradicted the conclusion that the only possible use of the 1.4 acres, before or after permit denial, was to combine it with the larger parcel of submerged land. Mr. Orr testified that the 1.4 acre strip was about 2000 feet long and about 25 to 30 feet in width, "[a]nd I couldn't see any way you could develop that little narrow strip of land there." Even though Mr. Orr and plaintiffs may have been attempting to limit his evaluation of the value of the strip of land to an after permit denial perspective,

the conditions Mr. Orr described which limited its use—the length, width and location of the strip—were the same before permit denial. Thus, it is logical to reach the same conclusion as to the absence of viable economical uses of the strip of land at issue before permit denial that Mr. Orr and both parties came to regarding the absence of viable economical uses after permit denial. According to Mr. Orr: "I still don't see any value to it *by itself.*" (emphasis added).

Prong one of the regulatory takings test states that there has been a taking if "there was a denial of economically viable use of the property *as a result of the regulatory imposition.*" *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1379 (quoting *Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1179) (emphasis added). Under the facts of this case, the lack of economically viable uses for the 1.4 acre strip of land does not result from the permit denial, but inheres in the nature of the strip of land itself—its length, width, and location.

Plaintiffs argue, however, that "[t]his situation is related to, although not identical with, severance damages that are owed by the government when a physical taking of one portion of property causes damages to a portion of the property not taken," citing *Hendler v. United States,* 175 F.3d 1374 (Fed.Cir.1999). The United States Court of Appeals for the Federal Circuit in *Hendler* stated the rule for plaintiffs' severance damages theory:

> In cases of a partial physical taking as that here, just compensation under the takings clause of the Constitution includes "not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing ... injury due to the use to which the part appropriated is to be devoted."

*Hendler v. United States,* 175 F.3d at 1383 (quoting *United States v. Grizzard,* 219 U.S. 180, 183, 31 S.Ct. 162, 55 L.Ed. 165 (1911)).

In *Hendler,* the federal government entered the plaintiffs' land and sunk wells to monitor the migration of contaminated water. *Id.* at 1376. The plaintiffs in *Hendler* argued, inter alia, that the property taken by

the government made their remaining property not taken by the government unmarketable. *Id.* at 1384. Disagreeing with plaintiffs in *Hendler,* the Federal Circuit affirmed the Court of Federal Claims' rejection of the severance damages theory in that case, on the grounds that the value of plaintiffs' remaining property was reduced, not by the government's monitoring wells, but by the migrating contamination itself. *Id.* at 1384–85. Similarly, the lack of value in the plaintiffs remaining property in the present case, the 1.4 acre strip, is a result of the length, width and location of the strip and, indirectly, the navigational servitude, which removed the adjoining submerged parcel from the proposed joint development of the adjoining parcels.

The United States Court of Appeals for the Federal Circuit in *Hendler* also noted that:

> If a regulation categorically prohibits all economically beneficial use of land there is, without more, a compensable taking. *See Florida Rock,* 18 F.3d at 1564–65. On the other hand, though it is not necessary to have a total wipeout before the Constitution compels compensation, if the regulatory action is not shown to have had a negative economic impact on the property, there is no regulatory taking. *See generally id.* at 1569–71; *Loveladies,* 28 F.3d at 1180. The question of the economic impact of a particular regulatory action is of course fact-specific to the case. *See Florida Rock,* 18 F.3d at 1570.

*Hendler v. United States,* 175 F.3d at 1385. Under the present facts, the Corps' regulatory action—the denial of a permit to dredge and fill the 1.4 acres—did not have a negative economic impact on the 1.4 acres, because of the length, width and location of the strip of land itself and the inability to exploit the strip of land independently of the adjoining 49.3 acres. The 1.4 acre strip does not have value in and of itself.

It is settled law in Fifth Amendment takings cases that a strip of land along the shore does not take value from submerged land as to which the navigational servitude applies. *See United States v. Twin City Power Co.,* 350 U.S. at 225, 76 S.Ct. 259 (the owner of

land along the shore sought, and was denied, "a value in the flow of the stream, a value that inheres in the government's [navigational] servitude . . . ."); *Owen v. United States,* 851 F.2d at 1409–10 ("[T]he fair value which is to be paid by the government for the taking of fast land does not include any value derived from access to or use of the stream or its flow.") (citing *Kaiser Aetna v. United States,* 444 U.S. 164, 177, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)); *United States v. 30.54 Acres of Land,* 90 F.3d at 794 ("But the Constitution 'permits the Government to disregard the value arising from [the] fact of riparian location in compensating the owner when fast lands are appropriated.'") (quoting *United States v. Rands,* 389 U.S. at 124, 88 S.Ct. 265) (alteration in original).

As found earlier, the plaintiffs may not develop the 49.3 acres of lake bottom due to the Corps' permit denial, which was based, in part, on the navigational servitude. Plaintiffs have failed to demonstrate that it was the Corps' permit denial that took away the value of the 1.4 acres. Instead, the 1.4 acres were impacted by the adjoining 49.3 acres of submerged land, as to which the navigational servitude applies, a factor which cannot be invoked to enhance the value of the 1.4 acres, and the peculiar length, width and location of the shoreline strip of land itself, which eliminated economically viable uses (prong one of the regulatory takings test).

*State and Local Permits*

Defendant also contends that state and local authorities, based on their land use regulations, would have prevented any development of the plaintiffs' property, such that the Corps' permit denial effectively was without any economic impact. Defendant argues that, because plaintiffs cannot establish that they could obtain the necessary State of Florida, County of Palm Beach and City of Riviera Beach approvals for their proposed development, plaintiffs, therefore, cannot establish the requisite adverse economic impact as a result of the Corps' permit denial.

The United States Supreme Court, in *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), addressed use restrictions, among other issues. In *Palazzolo,* a landowner's development proposals

for his coastal wetlands were rejected by the Rhode Island Coastal Resources Management Council (the Council), and he brought a takings claim in the Rhode Island State courts. *Id.* at 611, 121 S.Ct. 2448. The landowner had not obtained approvals for his proposed project from the state and nearby municipality. *Id.* at 624, 121 S.Ct. 2448. As to potential land use restrictions, the Supreme Court stated that:

> The State's concern may be that landowners could demand damages for a taking based on a project that could not have been constructed under other, valid zoning restrictions quite apart from the regulation being challenged. This, of course, is a valid concern in inverse condemnation cases alleging injury from wrongful refusal to permit development.
>
> \*  \*  \*  \*  \*  \*
>
> The mere allegation of entitlement to the value of an intensive use will not avail the landowner if the project would not have been allowed under other existing, legitimate land use limitations. When a taking has occurred, under accepted condemnation principles the owner's damages will be based upon the property's fair market value, *see, e.g., Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); 4 J. Sackman, Nichols on Eminent Domain § 12.01 (rev.3d ed.2000)—an inquiry which will turn, in part, on restrictions on use imposed by legitimate zoning or other regulatory limitations, *see id.,* at § 12C.03[1].

*Palazzolo v. Rhode Island,* 533 U.S. at 625, 121 S.Ct. 2448; *see also Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1363 ("This does not mean that use restrictions are irrelevant to the takings calculus, even in categorical takings cases. Once a taking has been found, the use restrictions on the property are one of the factors that are taken into account in determining damages due the owner."). Under these analyses, potential land use restrictions represent a damages issue.

Defendant contends that state and local land use restrictions will be an impediment to the plaintiffs' proposed development, and, therefore, should be factored into the equation in determining whether a regulatory taking has occurred, before the anticipated impediments ripen. Defendant's crystal ball, however, is not completely clear on this point. The Federal Circuit in this case addressed the role of the State of Florida in the plaintiffs' proposed development:

> In Florida, title to the beds of navigable waterbodies is held by the state in public trust; the Trustees of the Internal Improvement Fund administer the trust, and in general have power to convey submerged lands to private owners if the sale is not contrary to the public interest. In the early years of Florida's development, much of the State's sovereignty land was so conveyed.

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1378 n. 2 (citation omitted). The Federal Circuit noted that, in a settlement between the Florida Department of Environmental Regulation (DER) and plaintiffs, the state acknowledged that, pursuant to the terms of the deed from the Trustees of the Internal Improvement Fund, plaintiffs had the legal right to dredge and fill the 49.3 submerged acres. *Id.* at 1378.

Defendant, however, states that, after the conclusion of the hearing in the present case, it first learned of a May 31, 1994 State of Florida DER Suggestion of Error and Motion for Remand, filed by the DER in the Florida Supreme Court in an attempt to avoid its earlier settlement of the case with plaintiffs. The Florida DER attempted to reverse its prior position, and requested that the matter be remanded for an administrative hearing to determine anew if permits are required to dredge and fill plaintiffs' property. Defendant further advises the court that, pursuant to the Florida DER's motion, the matter has been remanded and stayed pending resolution of this present litigation in the Court of Federal Claims. Defendant's information is incorrect. On April 24, 1995, the Supreme Court of Florida denied the Florida DER's motion for remand. *See Singer Island Civic Ass'n, Inc., et al. v. Dep't of Env't Regulation,* No. 83,470, Order at 1 (Fla. Apr. 24, 1995). Defendant was served with a copy of the *Singer Island Civic Association* case by plaintiffs, and have conceded the point.

The court, therefore, has no indication that the State of Florida intends to impede plaintiffs' plans for development.

In continuing the review of defendant's contention, that state and local land use restrictions loom in the future, plaintiffs point to recent litigation regarding property similar to that of the plaintiffs, which indicates that the City of Riviera Beach's Comprehensive Land Use Plan does not prohibit similarly proposed property development. *See Joan B. Taylor v. City of Riviera Beach,* No. CL 00–2662 AJ (Fla. 15th Cir. Ct. June 6, 2003) ("[I]f the Plaintiff/owner or her successor obtains the necessary permits to fill the Subject Property from every applicable State and/or Federal agency, no fill permit is needed from the Defendant City of Riviera Beach for the work to proceed to fill Subject Property.") Defendant also concedes this point. The court has no indication in the record before it, that the City of Rivera Beach itself intends to impede plaintiffs' plans for development.

Defendant nevertheless retains faith that the County of Palm Beach will frustrate plaintiffs' development plans, such that the Corps' permit denial is without consequence. The record does contain a January 10, 1989 resolution by the Board of County Commissioners of the County of Palm Beach opposing the plaintiffs' proposed development, as contrary to the public interest. Defendant argues that an application from the plaintiffs to the county for project approval would be rejected. Defendant argues that the Corps' disapproval essentially did not matter since the project would have been disapproved by county authorities anyway, and that the absence of viable economical uses is a function of not being able to surmount all of these obstacles.

The court, however, cannot rely on defendant's power of prediction. Defendant argued that the State of Florida and the City of Palm Beach would frustrate plaintiffs development plans, contentions which are, upon further review, incorrect. Defendant has not presented the court with a county permit denial, and merely speculates that its county

argument will not evaporate, as have its state and city arguments. On the other hand, the Corps' permit denial has occurred and is before the court, on specific remand issues from the United States Court of Appeals for the Federal Circuit. As indicated by the Supreme Court in *Palazzolo* and the Federal Circuit in the present case, other land use restrictions are not irrelevant, but typically are considered in the damages phase of a case. In light of the court's earlier findings, that the Corps' permit denial had a navigational purpose, and that the acknowledged absence of economically viable uses for the 1.4 acre strip was not the result of federal regulatory imposition, the court need not reach the defendant's land use restrictions argument.

## CONCLUSION

The United States Court of Appeals for the Federal Circuit previously, in its first remand opinion, concluded that the denial by the Army Corps of Engineers of the plaintiffs' requested permit to dredge and fill represents a categorical taking of the 49.3 acres of lake bottom; that this submerged land is subject to the federal navigational servitude; and that the navigational servitude may serve as a complete defense to a regulatory taking. *See Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1381–84. After further discovery and a hearing upon remand, this court finds that defendant has demonstrated a bona fide federal navigational purpose in the permit denial as to plaintiffs' 49.3 submerged acres. *See Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357. Therefore, as to the 49.3 acres, the permit denial by the Corps did not constitute a compensable regulatory taking.

The Federal Circuit, in its Order on the petition for rehearing, also stated that since the adjoining 1.4 acre parcel along the shore of Lake Worth is not submerged property, these 1.4 acres are not subject to the federal navigational servitude defense. *See Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1365. This court finds, however, that the absence of economically viable uses of the

1.4 acres resulted, not from the permit denial, but from the nature of the 1.4 acre narrow strip of land itself and the inability to develop this strip of land without the adjoining 49.3 acres, the latter having been removed from the equation by the federal navigational servitude. Therefore, as to the 1.4 acres, the permit denial by the Corps also did not constitute a compensable regulatory taking.

**IT IS SO ORDERED.**